Marjorie R. MAGUIRE, Plaintiff-Respondent-Cross-Appellant, ††

v.

JOURNAL SENTINEL, INC. and Mary Beth Murphy, Defendants-Appellants-Cross-Respondents,†

Keith SPORE, Defendant.

Court of Appeals

*No. 97–3675. Oral argument August 18, 1999.—Decided December 14, 1999.*

## 2000 WI App 4

(Also reported in 605 N.W.2d 881.)

††Petition to cross-review denied.
†Petition to review denied.

*See Callaghan's Wisconsin Digest, same topic and section number.

On behalf of the defendants-appellants-cross-respondents, the cause was submitted on the briefs of *John R. Dawson, James L. Huston* and *Paul Bargren* of *Foley & Lardner* of Milwaukee.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *Marjorie Reiley Maguire* of Milwaukee.

Before Wedemeyer, P.J., Schudson and Curley, JJ.

¶ 1. WEDEMEYER, P.J.   Journal Sentinel, Inc. and Mary Beth Murphy (Journal) appeal from a judgment entered after a jury found in favor of Marjorie R. Maguire in a libel action. The Journal claims: (1) the trial court erred in ruling as a matter of law that Marjorie was not a limited purpose public figure; and (2) the trial court erred when it ruled that the alleged libel at issue was not "substantially true." Because we conclude that Marjorie was not a limited purpose public figure, and that the statement sued upon was not "substantially true," we affirm.

¶ 2.   Marjorie cross-appeals from the same judgment claiming: (1) the trial court erred when it denied her motion for default judgment made when the Journal filed an allegedly late answer to her complaint, and her request for a $2,000,000 default judgment should be entered; (2) the trial court erred when it dismissed

239

her punitive damages claim; (3) the trial court erred when it dismissed two individual defendants, Keith Spore and Robert Kahlor, who were employees of the Journal; (4) the media privilege statute, as applied, § 895.05(1), STATS., and the referee statute, § 805.06, STATS., are unconstitutional; (5) we should define the limits of discovery in a defamation action; and (6) we should reconsider our dismissal, under § 895.05(1), of her four other counts of libel. Marjorie raises the default judgment issue in the alternative to her request to affirm the judgment. Because we affirm the judgment, we need not address this issue raised in the cross-appeal. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issues need to be addressed). Because the trial court did not err in dismissing the punitive damage claim, because the trial court did not err in dismissing Spore and Kahlor, because we decline to address the constitutional challenges, because the discovery issue is moot, and because we decline to reconsider our earlier decision, we affirm on the cross-appeal.

## BACKGROUND

¶ 3.  In October 1994, Marjorie sued the Journal and five employees. She alleged five counts of libel published in two separate articles. The articles were published in the aftermath of a divorce between Marjorie and her ex-husband, Daniel Maguire. Daniel, who was a theology professor at Marquette University, sought a harassment injunction against Marjorie. The article at issue was part of the news coverage of the injunction proceeding. After Marjorie brought her suit against the Journal and its employees, the newspaper filed a motion to dismiss, which was treated as a summary judgment motion. The trial court granted the

240

motion and Marjorie appealed. We affirmed the summary judgment as to four of the five counts of libel, ruling that they could not survive summary judgment because each was a "true and fair report" from a judicial proceeding, which falls under the media privilege embodied in § 895.05(1), STATS. *See Maguire v. Journal/Sentinel, Inc.*, No. 95–0841, unpublished slip op. (Wis. Ct. App. Nov. 14, 1995). We determined, however, that the fifth alleged claim of libel could not be dismissed on summary judgment because it fell outside the scope of the media privilege statute. The statement at issue emanated from an October 27, 1992, article which stated, in pertinent part, that Marquette posted a guard outside of Daniel's classroom after Marjorie *assaulted* him at the university.[1] (Emphasis added.) We concluded that this statement was capable of a defamatory meaning and that the newspaper was not protected by § 895.05(1).[2] Before we could address whether the constitutional privilege for media defendants applied, however, a determination was needed as to whether Marjorie was a public figure. We remanded the matter to the trial court for this determination with the following instructions:

> (1) if Marjorie is not a public figure, the case must be set for trial because she has raised a genuine issue of fact as to whether an assault actually

---

[1] The challenged direct quote from the article provided: "Marquette posted a guard at his [Daniel Maguire's] classroom after she assaulted him at the university."

[2] We reached this determination because the allegedly libelous statement at issue was not a factual report of what occurred at the injunction hearing. The statement stemmed from a private conversation the *Journal* reporter had with Daniel outside the courtroom after the injunction hearing.

241

occurred; or (2) if the trial court determines she is a public figure, it must examine the pleadings to see if Marjorie alleged that the newspaper acted with actual malice. If actual malice was not alleged, the case should be dismissed; if actual malice was alleged, the case should proceed to trial on this instance of alleged libel.

¶ 4. On remand, the trial court determined that Marjorie was not a public figure for the purposes of this particular matter. The case was set for a jury trial. The jury returned a verdict in favor of Marjorie and awarded damages for the defamation in the amount of $450,000. Judgment was entered. The Journal now appeals and Marjorie cross-appeals.

## DISCUSSION

*A. Appeal.*

¶ 5. The Journal challenges the judgment on two bases: (1) it asserts that the trial court erred as a matter of law when it determined that Marjorie was not a limited purpose public figure; and (2) even if Marjorie was not a limited purpose public figure, the trial court should have concluded that the statement was "substantially true" and therefore, not actionable. We reject each assertion.

*1. Public Figure Status.*

¶ 6. The first question in this case is whether the trial court correctly determined that Marjorie was not a public figure for the purposes of this case. Whether a person is a public figure is a legal issue. *See Lewis v. Coursolle Broadcasting of Wis., Inc.*, 127 Wis. 2d 105,

111, 377 N.W.2d 166, 168 (1985). There are generally two ways to obtain the label "public figure": (1) a person may receive the label for all purposes due to general fame or notoriety; or (2) a person may become a public figure for a limited purpose because of involvement in a particular public issue or controversy. *See Wiegel v. Capital Times Co.*, 145 Wis. 2d 71, 82, 426 N.W.2d 43, 48 (Ct. App. 1988).

¶ 7. In order for Marjorie to be included in the first category, she must be a well-known celebrity, or her name must be a household word. *See id.*; *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1294 (D.C. Cir. 1980). There is nothing in the record to warrant such a conclusion and, in fact, none of the members of the jury pool had ever heard of Marjorie Maguire. Accordingly, we cannot conclude that Marjorie meets this first test.

¶ 8. Therefore, the next question is whether Marjorie became a public figure for a "limited purpose" because of her involvement in a particular public controversy. *See Wiegel*, 145 Wis. 2d at 82, 426 N.W.2d at 48–49. In order to determine whether one may be considered a public figure for a limited purpose, we apply a three-step test. *See id.* at 82, 426 N.W.2d at 49. A defamation plaintiff can be found to be a limited purpose public figure if: (1) the plaintiff is involved in a public controversy; (2) the plaintiff's role in the controversy is more than trivial or tangential; and (3) the alleged defamation was germane to the plaintiff's participation in the controversy. *See id.* at 83, 426 N.W.2d at 49.

¶ 9. The parties dispute whether a public controversy exists pertinent to the libel determined in this case. The Journal argues that the public controversy at issue here arose from a broader public controversy sur-

rounding the ideals of feminism and liberal Catholicism, both of which Marjorie and her ex-husband were involved in promoting. As a part of this broader controversy, the Journal argues that the divorce between the two resulted in Marjorie creating a more narrow public controversy, which involved a "campaign for family values" and her attempt to discredit Daniel as a moral leader. This controversy involved: (1) Marjorie leaving a message on Daniel's answering machine stating that she was going to use the press to discredit him; (2) in September 1992, Marjorie confronting Daniel at the East Library before he was to speak to a pro-choice group, and Marjorie telling the organizer that it was a mistake to have Daniel as a spokesperson for this group because he was not a good Catholic and she threatened to tell the entire group about Daniel if he was allowed to speak; (3) a September 24, 1992, "In My Opinion" column Marjorie wrote, published in the Journal, which described husbands who unilaterally divorce their wives as suffering from the "Jesse Anderson" syndrome.

¶ 10.  Marjorie disputes the Journal's contention that any public controversy exists. She concedes that she confronted the organizer of the pro-choice group at the East Library and voiced her opinion when she discovered that Daniel was selected as a surprise speaker. Marjorie concedes that it was this incident that led Daniel to seek a civil injunction against her, and that the article from which the libel stems was reporting on the injunction hearing. Nevertheless, she argues that no public controversy exists. She indicates that the pro-choice meeting at the East Library was an organizational meeting attended by about a dozen people, there was no press coverage and it did not affect public interest. She also points out that her complaint about

244

Daniel did not disrupt the meeting. Rather, Daniel chose to leave, and the meeting took place in his absence.

¶ 11. In resolving the dispute, we first need to define public controversy.

> A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way . . . . [E]ssentially private concerns or disagreements do not become public controversies simply because they attract attention. Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.

See *Waldbaum*, 627 F.2d at 1296 (citation and footnote omitted). Based on this standard, we conclude that there was no public controversy. We agree with the trial court that: "Marjorie Maguire's views about her ex-husband and Catholics for Free Choice and about divorce are her own. There's been no evidence that there's been any public debate about her personal views or any press coverage about those views prior to the defamation article."

¶ 12. Marjorie concedes that she was upset about Daniel leaving her for another woman and that she pleaded with him not to divorce her. She did not take the divorce sitting down; she expressed her personal opinions about him. Nevertheless, this simply was not a matter of public interest; it did not affect the public in some appreciable way. Until the injunction hearing, this dispute did not receive "public attention." Prior to the injunction hearing, there was no press coverage of the Maguires' divorce. According to counsel for the

Journal, the Maguires' less-than-amiable separation was "simply not news." The record bears this out.

¶ 13.   Having concluded that no public controversy existed, we need not address the remaining portions of the limited purpose public figure test. If there is no public controversy, then Marjorie cannot be a limited purpose public figure.

¶ 14.   The Journal also argues that Marjorie is clearly a public figure because she had access to the media, pointing out that it was Marjorie's phone call to the religion editor which brought a reporter to the courthouse to report on the injunction hearing, leading to the October 27 article. We are not persuaded. Although access to the media is often an accouterment of public figure status and part of the rationale for distinguishing a public figure from the more vulnerable private individual who generally lacks access, it is certainly not determinative of public figure status. *See Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 164 (1979). The record here suggests that Marjorie's access to the media was limited and less than influential. When she denied the "assault" statement to the reporter and requested that the reporter print her denial if the "assault" statement was used, her request was not honored. When Marjorie repeatedly requested that the Journal print a retraction, the Journal chose to ignore these requests as well. Thus, Marjorie's "access" to the media, based on the record before us, was limited and not influential to the point of transcending her to public figure status.

## 2. Substantial Truth.

■■■

¶ 15.   The Journal next argues that even if Marjorie was not a limited purpose public figure, the statement was not actionable because it was substantially true, or "not false enough." In a defamation action, the defendant must make a false and defamatory statement concerning another. *See Van Straten v. Milwaukee Journal Newspaper-Publisher*, 151 Wis. 2d 905, 912, 447 N.W.2d 105, 108 (Ct. App. 1989). "Substantial truth" is a complete defense to a defamation action. *See Prahl v. Brosamle*, 98 Wis. 2d 130, 141, 295 N.W.2d 768, 776 (Ct. App. 1980).

¶ 16.   Citing *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993), the Journal also argues that the "assault" statement was not false enough to be actionable because, if they would have printed the whole truth, Marjorie would have been seen in a worse light. That is, they could have printed the facts pertaining to true instances where Marjorie "verbally assaulted" Daniel, where she grabbed his coat, where she dumped baptismal water on him, and where she embraced him against his will. We are not persuaded.

■■■

¶ 17.   The doctrine of substantial truth provides that "slight inaccuracies of expression" do not make the alleged libel false. *See Lathan v. Journal Co.*, 30 Wis. 2d 146, 158, 140 N.W.2d 417, 423 (1966). Therefore, the question is whether the instances delineated above qualify as "slight inaccuracies" so as to make the "assault" statement substantially true. We think not. We are unwilling to stretch the substantial truth doctrine this far. There is a great distinction between

printing a statement that contains "slight inaccuracies" and attempting to define slight inaccuracies to include separate conduct or incidents not discussed, addressed or contemplated when the statement was printed. The Journal actually confuses, or attempts to merge, the substantial truth doctrine with the doctrine of incremental harm. The doctrine of incremental harm does not address whether the statement is true or false, but rather goes to the question of whether a false statement damaged the plaintiff's reputation in light of the whole truth about other acts of the plaintiff. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 522–23 (1991). Wisconsin has not recognized the doctrine of incremental harm.

¶ 18.   Accordingly, we conclude that the presence of other true facts, which may fit the definition of "assault," does not make the libelous statement "substantially true." The record demonstrates that even Daniel, the subject of the alleged "assault," admitted that Marjorie did not physically assault him. Marjorie testified and produced evidence showing that she was having blood drawn and at a doctor's appointment on the date and time that the "assault" allegedly occurred. Under these circumstances, we agree that the "assault" statement was not substantially true. As determined by the jury, the statement was false.

¶ 19.   The Journal also contends that because the term "assault" is ambiguous, its use was close enough to the truth to protect the newspaper from liability. We disagree. This question was presented to the jury *ad nauseum*. The Journal argued that the statement was substantially true based on Marjorie's other encounters with Daniel. Marjorie presented evidence that the popular definition of assault almost always

implies physical contact and sudden, intense violence. In the previous appeal, we ruled that "assault" is capable of a defamatory meaning. "In determining whether language is defamatory, the words . . . must be construed in the plain and popular sense in which they would naturally be understood." *Frinzi v. Hanson*, 30 Wis. 2d 271, 276, 140 N.W.2d 259, 261 (1966). Employing the common meaning of the term, the jury found the assault statement was false and that it was defamatory. The Journal has not presented this court with any basis to overturn that verdict.

## B. Cross-appeal.

### 1. Punitive Damages.

¶ 20.   Marjorie argues that the trial court erred when it dismissed her claim for punitive damages. The trial court determined that there was insufficient evidence to show "knowledge of falsity or reckless disregard for the truth," i.e., actual malice, which is required to sustain a claim for punitive damages in a defamation action. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974); *Denny v. Mertz*, 106 Wis. 2d 636, 659, 318 N.W.2d 141, 152 (1982). We agree.

¶ 21.   Marjorie contends that she produced sufficient evidence to demonstrate actual malice so that a punitive damage issue could be presented to the jury. This evidence consisted of her allegations that the Journal failed to investigate Daniel's claim that he was assaulted, that the reporter testified she believed Marjorie was obsessed, and that the reporter destroyed her notes. We agree with the trial court's determination that this evidence was insufficient to present this issue to a jury.

¶ 22. In order to survive a summary judgment motion, the evidence must allow a jury to conclude that "the newspaper had published with actual malice, that is, with knowledge of falsity or with reckless disregard for the truth." *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 528, 563 N.W.2d 472, 475 (1997). The evidence here does not satisfy that standard. Failure to investigate adequately does not constitute actual malice. *See id.* at 542, 563 N.W.2d at 480. Further, although the destruction of the notes raises suspicion, we cannot conclude that this conduct constitutes actual malice because the notes were not relevant to the challenged libel. *See id.* at 548–49, 563 N.W.2d at 483. Unless the notes contained information to the effect that Daniel admitted he was untruthful in stating that Marjorie assaulted him, the notes would not show an inconsistency between what Daniel told the reporter and what was printed.

¶ 23. The test for proving actual malice is whether the Journal knew the statement was false, whether it seriously doubted the truth of the statement, or "had a high degree of awareness of probable falsity." *Id.* at 542, 563 N.W.2d at 480. The record simply does not support sending a punitive damage claim to the jury. Accordingly, the trial court did not err when it dismissed Marjorie's punitive damage claim.[3]

---

[3] As a part of this claim, Marjorie requests us to consider whether the heightened evidentiary burden of proof for a finding of actual malice, namely clear and convincing evidence, must be considered by a court in a summary judgment decision on actual malice. Case law has already decided this question in requiring that the libeled plaintiff must satisfy the heightened burden of proof. *See Van Straten v. Milwaukee Journal Newspa-*

## 2. Dismissal of Defendants Keith Spore and Robert Kahlor.

¶ 24.   Marjorie also claims that the trial court erred when it dismissed two defendants: Spore, who was the editor of the paper when the statement was published, and Kahlor, who was the chairman of the company. She claims that editors and publishers have a duty to know what they publish and are responsible for any libel. She argues that both should be reinstated and be defendants if a new trial occurs. The Journal argues that Marjorie waived this issue, and that even if she did not, neither Spore nor Kahlor had any knowledge of the article before it was published and, therefore, cannot be held responsible.

¶ 25.   This issue, however, presents some complications. We have affirmed the judgment and rejected Marjorie's request for a new trial on punitive damages. Therefore, there will be no new trial. Further, there is some dispute whether Kahlor's dismissal can even be raised in this appeal. Regardless, we conclude that the trial court did not err when it dismissed these two defendants, pursuant to *Maynard v. Port Publications, Inc.*, 98 Wis. 2d 555, 566–68, 297 N.W.2d 500, 506–07 (1980) (finding that for fault to exist, defendant either must know or have reason to know of the libel).

¶ 26.   In support of her position, Marjorie cites a case from 1896, *Smith v. Utley*, 92 Wis. 133, 138, 65 N.W. 744, 746 (1896), where our supreme court held that the managing editor of the *Racine Evening Times*, as well as the publisher, were liable for any libelous

*per-Publisher,* 151 Wis. 2d 905, 917, 447 N.W.2d 105, 110 (Ct. App. 1989); *Wiegel v. Capital Times Co.*, 145 Wis. 2d 71, 76, 426 N.W.2d 43, 46 (Ct. App. 1988). We are bound by these decisions and, therefore, decline to revisit this issue.

articles, despite the fact that the editor had no knowledge of the article. This case, however, was decided prior to *Gertz* where the United States Supreme Court determined that defamation liability cannot be established without fault. *See id.* at 386. Thus, in 1896, when *Smith* was decided, neither fault nor negligence, the standard Wisconsin adopted in *Denny*, was required to prove a defamation claim.

¶ 27.   Further, given the growth of technology and expansion of the press, roles formally served by the managing editor have changed. Although ideally, an editor should know what is being published in the paper, imposing such a duty on a large metropolitan paper would create too heavy a burden. Individual editors responsible for certain sections of the paper now fulfill the role formerly served by the managing editor when the *Smith* case was decided. Accordingly, we reject Marjorie's request to reinstate Spore and Kahlor.

### 3.   Constitutional Issues.

¶ 28.   Next, Marjorie challenges the constitutionality of both the media privilege statute, § 895.05(1), STATS., and the referee statute, § 805.06, STATS. We reject each in turn.

¶ 29.   The constitutionality of a statute is a question of law that we review independently. *See County of Kenosha v. C&S Management, Inc.*, 223 Wis. 2d 373, 382–83, 588 N.W.2d 236, 242 (1999). Our scope of review is limited where the constitutionality of a statute is involved. *See State ex rel. Grand Bazaar Liquors, Inc. v. City of Milwaukee*, 105 Wis. 2d 203, 208, 313 N.W.2d 805, 808 (1982). A statute is presumed to be constitutional and will be held unconstitutional only if it appears so beyond a reasonable doubt. *See State ex*

*rel. Hammermill Paper Co. v. La Plante*, 58 Wis. 2d 32, 46, 205 N.W.2d 784, 792 (1973). "[T]he burden of establishing the unconstitutionality of [the] statute is on the person attacking it, who must overcome the strong presumption in favor of its validity." *Id.* at 46, 205 N.W.2d at 792.

¶ 30.   Section 895.05(1), STATS., provides:

(1)   The proprietor, publisher, editor, writer or reporter upon any newspaper published in this state shall not be liable in any civil action for libel for the publication in such newspaper of a true and fair report of any judicial, legislative or other public official proceeding authorized by law or of any public statement, speech, argument or debate in the course of such proceeding. This section shall not be construed to exempt any such proprietor, publisher, editor, writer or reporter from liability for any libelous matter contained in any headline or headings to any such report, or to libelous remarks or comments added or interpolated in any such report or made and published concerning the same, which remarks or comments were not uttered by the person libeled or spoken concerning the person libeled in the course of such proceeding by some other person.

Marjorie argues that this statute was unconstitutionally applied to her because "it allows media defendants to use the shield of privilege as a sword to attack the reputation of a libel plaintiff." The Journal responds that Marjorie waived her right to challenge the statute and, if not, she has failed to adequately develop a constitutional challenge.

¶ 31.   We reject Marjorie's constitutional challenge because it is not essential to the determination of

this case. *See Kollasch v. Adamany,* 104 Wis. 2d 552, 561, 313 N.W.2d 47, 51 (1981) ("As a matter of judicial prudence, a court should not decide the constitutionality of a statute unless it is essential to the determination of the case before it."). Essentially, Marjorie's argument is that the statute allowed the Journal to use the privileged parts of the article to demonstrate that Marjorie's reputation had been so damaged by the privileged parts, that she is not entitled to any damages for the non-privileged part. Notwithstanding this claim, we have already decided to affirm the jury's verdict, finding that Marjorie is entitled to $450,000 for damages as a result of the publication of the non-privileged assault statement. Therefore, resolution of the constitutional challenge leveled here is not essential to the determination of this case.

¶ 32.    The second statute challenged by Marjorie is the referee statute, § 805.06, STATS.[4] Marjorie argues

---

[4] Section 805.06, STATS., provides:

(1)  A court in which an action is pending may appoint a referee who shall have such qualifications as the court deems appropriate. The fees to be allowed to a referee shall be fixed by the court and shall be charged upon such of the parties or paid out of any fund or subject matter of the action, which is in the custody and control of the court, as the court may direct. The referee shall not retain the referee's report as security for compensation; but if the party ordered to pay the fee allowed by the court does not pay it after notice and within the time prescribed by the court, the referee is entitled to a writ of execution against the delinquent party.

(2)  A reference shall be the exception and not the rule. In actions to be tried by a jury, a reference shall be made only when the issues are complicated; in actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it.

(3)  The order of reference to the referee may specify or limit the referee's powers and may direct the referee to report only upon

254

particular issues or to do or perform particular acts or to receive and report evidence only and may fix the time and place for beginning and closing the hearings and for the filing of the referee's report. Subject to the specifications and limitations stated in the order, the referee has and shall exercise the power to regulate all proceedings in every hearing before the referee and to do all acts and take all measures necessary or proper for the efficient performance of duties under the order. The referee may require the production of evidence upon all matters embraced in the reference, including the production of all books, papers, vouchers, documents, and writings applicable thereto. The referee may rule upon the admissibility of evidence unless otherwise directed by the order of reference and has the authority to put witnesses on oath and may personally examine them and may call the parties to the action and examine them upon oath. When a party so requests, the referee shall make a record of the evidence offered and excluded in the same manner and subject to the same limitations as a court sitting without a jury.

(4) (a) When a reference is made, the clerk shall forthwith furnish the referee with a copy of the order of reference. Upon receipt thereof unless the order of reference otherwise provides, the referee shall forthwith set a time and place for the first meeting of the parties or their attorneys to be held within 20 days after the date of the order of reference and shall notify the parties or their attorneys. It is the duty of the referee to proceed with all reasonable diligence. Any party, on notice to the parties and the referee, may apply to the court for an order requiring the referee to speed the proceedings and to make the report. If a party fails to appear at the time and place appointed, the referee may proceed ex parte or may adjourn the proceedings to a future day, giving notice to the absent party of the adjournment.

(b) The parties may procure the attendance of witnesses before the referee by the issuance and service of subpoenas. If without adequate excuse a witness fails to appear to give evidence, the witness may be punished as for a contempt and be subjected to the consequences, penalties, and remedies provided in ss. 885.11 and 885.12.

(c) When matters of accounting are in issue, the referee may prescribe the form in which the accounts shall be submitted and in any proper case may require or receive in evidence a statement by a certified public accountant who is called as a witness. Upon objec-

255

section 9 of the Wisconsin Constitution and because it violates both due process and equal protection requirements. The Journal argues that Marjorie waived her right to challenge the constitutionality of this statute because she failed to raise this issue in her postverdict motions. We decline to engage in the analysis requested because it is not essential to the determina-

tion of a party to any of the items thus submitted or upon a showing that the form of statement is insufficient, the referee may require a different form of statement to be furnished, or the accounts or specific items thereof to be proved by oral examination of the accounting parties or upon written interrogatories or in such other manner as the referee directs.

(5) (a)   The referee shall prepare a report upon the matters submitted by the order of reference and, if required to make findings of fact and conclusions of law, the referee shall set them forth in the report. The referee shall file the report with the clerk of the court and in an action to be tried without a jury, unless otherwise directed by the order of reference, shall file with it a transcript of the proceedings and of the evidence and the original exhibits. The clerk shall forthwith mail to all parties notice of the filing.

(b)   In an action to be tried without a jury the court shall accept the referee's findings of fact unless clearly erroneous. Within 10 days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and upon notice. The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instruction.

(c)   In an action to be tried by a jury the referee shall not be directed to report the evidence. The referee's findings upon the issues submitted are admissible as evidence of the matters found and may be read to the jury, subject to the ruling of the court upon any objections in point of law which may be made to the report.

(d)   The effect of a referee's report is the same whether or not the parties have consented to the reference; but, when the parties stipulate that a referee's findings of fact shall be final, only questions of law arising upon the report shall thereafter be considered.

tion before us. *See Kollasch*, 104 Wis. 2d at 561, 313 N.W.2d at 51.[5]

## 4. *Discovery.*

¶ 33.  Marjorie next requests that we define discovery limits in a libel case. She argues that a libeled plaintiff should not be required to turn over "such things" as Christmas card lists, personal letters, scrapbooks, computer hard disc drives and medical records. The Journal responds that this issue need not be addressed because Marjorie was not adversely affected by the discovery requests and, therefore, does not have a right to appeal. *See Weina v. Atlantic Mut. Ins. Co.*, 177 Wis. 2d 341, 345, 501 N.W.2d 465, 467 (Ct. App. 1993).

¶ 34.  The Journal claims that Marjorie responded to most of the discovery requests simply by indicating that she did not have any of the documents requested. Marjorie does not dispute this, but in reply argues that she spent time looking for the documents requested and would have had to turn the documents over, had she found any, before being able to challenge the "abusive discovery." Under these circumstances, we conclude this issue is simply not ripe for determination. *Cf. Pension Management, Inc. v. DuRose*, 58 Wis. 2d 122, 128, 205 N.W.2d 553, 555–56 (1973). Although the discovery requests were undoubtedly exhaustive, Marjorie's discovery compliance did not result in turn-

---

[5] We do note that the predecessor to § 805.06, STATS., was found to be constitutional. *See Home Ins. Co. v. Security Ins. Co.*, 23 Wis. 171 (1868). However, the constitutionality determination was based in part on the predecessor's requirement that the parties consent to assigning a referee.

ing over the private documents that she now claims should be left private.

## 5. Reconsideration.

¶ 35. Finally, Marjorie's last request is that we reconsider our earlier decision, which concluded that the other alleged instances of libel were not actionable because they fell under the media privilege statute. We decline to do so. That earlier decision is the law of the case, and we see no reason to revisit it here. *See State ex rel. Blackdeer v. Township of Levis*, 176 Wis. 2d 252, 261, 500 N.W.2d 339, 342 (Ct. App. 1993). [6]

---

[6] We are compelled to respond to the dissent, for fear that some may interpret our silence as agreement to some of the statements found in the dissent. First, we reiterate the rule that an appellate judge should file a separate opinion only in a case of conscientious difference on fundamental principles. *See* SCR 60.01(16) (1993–94). We are also compelled to comment briefly on the purpose of a dissent and a judge's responsibility.

> If a judge merely deems his own view preferable, and the establishment of some rule counts more than the rule itself, he should, at most, record his dissent in two words or preferably keep his silence. . . . Above all, he should keep his opinion impersonal. . . . Reference to the majority opinion should be kept at a minimum.

RUGGERO J. ALDISERT, OPINION WRITING 170–71 (1990) (citing Traynor, *Some Open Questions on the Work of State Appellate Courts*, 24 U. CHI. L. REV. 211, 218–19 (1957). Aldisert points out that if an appellate judge dissents because he believes the case should reach a different result, "[c]are should be taken . . . for the sake of collegiality." *Id.* at 170. In his dissent, Judge Schudson abandons his responsibility to take such care.

Roscoe Pound offers the following pertinent comments as to a judge's responsibility when dissenting:

> The opinions of [a] judge . . . are no place for intemperate denunciation of the judge's colleagues, violent invective, attributings of bad motives to the majority of the court, and insinuations of incompe-

*By the Court.*—Judgment affirmed.

¶ 36.   **SCHUDSON, J.** *(concurring in part; dissenting in part).* Under the *Wiegel* test, I conclude that

> tence, negligence, prejudice or obtuseness of fellow members of the court. . . . To justify a denunciatory dissenting opinion, if denunciation of his colleagues by a judge can be justified at all, the question of law should be one of exceptional importance and the errors pointed out should be of the gravest nature. . . . [T]he opinion of the judge . . . should express his reason, not his feelings.

ROBERT A. LEFLAR, APPELLATE JUDICIAL OPINIONS 206 (1974) (quoting Roscoe Pound, *Cacoethes Dissentiendi: The Heated Judicial Dissent*, 39 A.B.A.J. 794 (1953). Ignoring these principles, the dissent misinterprets the content of the majority on some issues and labels the majority's analysis "cursory" on others. Such attack is not only improper, but here, the dissent is simply wrong. Further, the dissent's attack rests in the dissenter's *belief*, not in reason. Although at times, it is certainly difficult to accept another colleague's style of writing or choice of analysis, a judge sitting on an elected panel has a responsibility and duty to do so. Justice requires it, lest the energy of a judge be focused on attacking colleagues instead of determining whether a party has been aggrieved at the trial court level.

We must assume that Judge Schudson has concluded that this case represents a situation requiring a dissent, despite the fact that the trial court and two of his colleagues on the court of appeals have reached different legal conclusions. However, there is never an instance when an appellate decision should contain an attack on a party based upon an apparent grudge or personal opinion unsupported by the record. Consequently, we must object to the statements found in the dissent describing the *Journal Sentinel* as a "shameful newspaper" and the statement that follows that the writer, "like so many members of our community," now subscribe to another publication because the *Journal Sentinel* "maliciously misrepresents facts, libels individuals, embarrasses the many good journalists on its staff, and seriously disserves our citizens." The legal disputes posed in

Marjorie Maguire, by virtue of her involvement in a public issue or controversy, was a limited purpose public figure. *See Wiegel v. Capital Times Co.*, 145 Wis. 2d 71, 426 N.W.2d 43 (Ct. App. 1988). As a limited purpose public figure, Marjorie, in order to prevail in her libel action, had to establish not only that the *Milwaukee Sentinel* article was defamatory, but also that it was printed with "actual malice." *See id.* at 82, 426 N.W.2d at 49. She failed to establish either. Indeed, under *Lathan v. Journal Co.*, 30 Wis. 2d 146, 158, 140 N.W.2d 417, 423 (1966), the portion of the article she challenged was "substantially true." Therefore, on the two central issues of the appeal, I disagree with the majority's analysis and would reverse.

¶ 37.   The majority concludes that Marjorie was not a limited purpose public figure because she was not involved in a "public controversy" and, therefore, did not meet the first part of the *Wiegel* test. As the majority acknowledges, however, although " 'private concerns or disagreements do not become public controversies simply because they attract attention,' " they do become public controversies when they " 'receive[ ] public attention because [their] ramifications will be felt by persons who are not direct participants.' " Majority op. at 245 (quoting *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980)). In the instant case, the undisputed

this libel suit never concerned the question as to whether or not the *Journal Sentinel* had declining circulation numbers, nor is there a scintilla of evidence in the record supporting the writer's pejorative description of the paper. Thus, we can only believe these statements reflect either a grudge, which the writer bears against the *Journal Sentinel*, or represent the personal opinions of the writer, neither of which have any place in judicial decision making or appellate decisions.

facts establish that Marjorie's "private concern[ ] or disagreement" with Daniel became a public controversy and, indeed, did so precisely because of Marjorie's efforts to assure "public attention" so that the "ramifications" of her disagreement with Daniel would "be felt by persons who are not direct participants."

¶ 38. The majority, while conceding that Marjorie "did not take the divorce sitting down" and "expressed her personal opinions about [Daniel]," majority op. at 245, fails to acknowledge the crucial point: Marjorie, with considerable success, attempted to *connect* what she viewed as Daniel's hypocritical statements and behavior to broad, public issues on which she and he were publicly recognized authorities. In fact, it was Marjorie's apparent ability to convey that connection that enabled her to garner press attention. After all, had Marjorie been expressing nothing more than her displeasure with Daniel's decision to divorce, the press would have had little if any interest. Here, however, Marjorie convinced reporter Mary Beth Murphy that there was much more—and what more there was transformed Marjorie's private dispute into a public controversy involving issues of Catholicism and divorce, among others. *See generally Bay View Packing Co. v. Taff*, 198 Wis. 2d 653, 678–83, 543 N.W.2d 522, 531–33 (Ct. App. 1995); *Erdmann v. SF Broad. of Green Bay, Inc.*, 229 Wis. 2d 156, 164–66, 599 N.W.2d 1, 5–7 (Ct. App. 1999). Thus, Marjorie became a limited purpose public figure.[1]

_____

[1] The majority, resolving this aspect of the appeal on the first part of the three-part *Wiegel* test, declines to discuss the other two parts. Deciding the first part differently, however, I must also consider the rest of the test. I am satisfied that: (1) Marjorie's role in the controversy was more than trivial or tan-

¶ 39. The majority also concludes "that the presence of other true facts, which may fit the definition of 'assault,' does not make the libelous statement 'substantially true.' " Majority op. at 248. I disagree.

¶ 40. The evidence confirmed what, I thought, was well known: "assault" has many meanings and may include verbal as well as physical conduct. *See* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 110 (3d ed. 1992) (listing first definition of "assault" as a "violent physical *or verbal* attack") (emphasis added). Now, however, based on Marjorie's evidence, the majority tacitly accepts "that the popular definition of assault *almost always implies* physical contact and sudden, intense violence." Majority op. at 248–49 (emphasis added). That assertion, to say the least, is dubious. And even if "the popular definition of assault almost always implies physical contact and sudden, intense violence," the majority's analysis still fails for two reasons.

¶ 41. First, evidence that Marjorie *physically* confronted Daniel a number of times—grabbing his coat, grabbing his arm, pushing and embracing him against a wall, and pouring their deceased son's baptismal water on him—renders the article's reference to an

gential; and (2) the alleged libel was germane to Marjorie's participation in the controversy. *See* majority op. at 243; *Wiegel v. Capital Times Co.*, 145 Wis. 2d 71, 83, 426 N.W.2d 43, 49 (Ct. App. 1988); *see also Bay View Packing Co. v. Taff*, 198 Wis. 2d 653, 678–83, 543 N.W.2d 522, 531–33 (Ct. App. 1995).

Similarly, in the appeal, the majority had no need to address whether Marjorie proved "actual malice." I, however, having concluded that Marjorie was a limited purpose public figure, must do so. I conclude that Marjorie failed to establish actual malice. The majority, deciding the cross-appeal, agrees. *See* majority op. at 250.

assault "at the university" as nothing more than a " 'slight inaccurac[y]' " about the location of the assault. *See Lathan*, 30 Wis. 2d at 158, 140 N.W.2d at 423. Thus, the article was "substantially true." *See id.*; *see also Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 302–03 (2d Cir. 1986) (statement implying that plaintiff was currently an adulterer was substantially true although plaintiff had ceased being an adulterer after "unabashedly committ[ing] adultery" for thirteen of seventeen years); *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 369 (S.D.N.Y. 1998) (statements that plaintiff was the "main" or "prime" suspect were substantially true in light of plaintiff's admission that he had been "a" suspect); *Corporate Training Unlimited, Inc. v. National Broad. Co.*, 981 F. Supp. 112, 120–21 (E.D.N.Y. 1997) (statement that plaintiff was "forced to leave the military for less than satisfactory service" was substantially true where plaintiff, rather than face a court martial, submitted a request for discharge "for the good of the service" after it was discovered that plaintiff had engaged in "financial improprieties") (internal quotation marks omitted); *Aequitron Med., Inc. v. CBS, Inc.*, 964 F. Supp. 704, 716 (S.D.N.Y. 1997) (use of the word "alarm" was substantially true although plaintiff actually used a "monitor" device).[2]

---

[2] In *Jewell*, the court further explained:

Admittedly, there is a difference between the statements inasmuch as the word "a" implies that Jewell was one of a few people being investigated, whereas the plain meaning of the words "prime" and "main" indicate that Jewell was the leading suspect. Nonetheless, a reasonable reader would not have reacted differently to either these specific statements or the overall content of the July 31 Column based upon this difference in terminology. Under either usage, the main "sting" or "gist" of the overall content of the column was the same . . . .

¶ 42.  Second, if a newspaper's First Amendment rights recede based on an appellate court's dubious determination of what "the popular definition" of a word "almost always implies," journalists will forever be chilled. Let's not forget that, in this case, the majority is declaring that Journal Sentinel's liability results from Murphy's *accurate* reporting of her interview of Daniel Maguire who, according to the article, said that Marjorie had "harassed" him "for more than two years" and had "assaulted him at the university." For all we know, Daniel may have used those words to refer to non-physical conduct. If an appellate court can adopt and interpose one party's sense of what "the popular definition" of a word "almost always implies," and if it can then substitute that sense for the definition in the dictionary and, possibly, for the unknown definition in the mind of the person who spoke the word, then journalists will never know where their liability logically begins and ends. *See Kelli T-G. v. Charland*, 198 Wis. 2d 123, 130, 542 N.W.2d 175, 178 (Ct. App. 1995) ("virtual impossibility of defining a sensible starting or stopping point" precludes tort liability on public policy grounds).

¶ 43.  By her own account, Marjorie Maguire engaged in a crusade to discredit Daniel Maguire by exposing what she deemed to be his hypocrisy. She did so publicly. She connected their divorce dispute to public issues on which she and Daniel were prominent public spokespersons. She sought press coverage of her efforts. Mary Beth Murphy accurately reported

*Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 369 (S.D.N.Y. 1998). Similarly, here, whether Marjorie assaulted Daniel at the university or at some other location, "a reasonable reader would not have reacted differently," because the " 'gist' of the overall content of the [article] was the same."

Daniel's comments responding to questions about Marjorie's claims. Marjorie, a limited purpose public figure, failed to establish that Murphy's report was either inaccurate or malicious.

¶ 44.   Concluding, as a matter of law, that Journal Sentinel's arguments should have prevailed in this appeal, I must confess to a certain self-consciousness. Lest anyone imagine that my conclusion might have been affected by Journal Sentinel's political power, I must disclose that I, like so many members of our community, believe that in the last twenty years or so the *Milwaukee Sentinel* and the once responsible and respected *Milwaukee Journal* steadily deteriorated and ultimately became a single, shameful newspaper—a newspaper that, indeed, maliciously misrepresents facts, libels individuals, embarrasses the many good journalists on its staff, and seriously disserves our citizens. Thus, years ago, like so many of my neighbors, I terminated my *Journal Sentinel* subscription and now delight in the daily delivery of the *New York Times*. Nevertheless, newspapers, whether responsible or shameful, enjoy strong First Amendment protection and I, whether right or wrong in my assessment of journalistic quality, must attempt to identify what I view as the majority's mistaken message.

¶ 45.   In this case, the alleged libel was "a quarrel over semantics." *See Lathan*, 30 Wis. 2d at 154, 140 N.W.2d at 421. This is not even a close call. The chilling precedent implicit in the majority's decision ultimately will freeze First Amendment rights—of both shameful

and responsible newspapers. Accordingly, on the appeal, I respectfully dissent.[3]

---

[3] On the cross-appeal, although I agree that we must affirm, I do not join in the majority's opinion. Moreover, because the majority opinion, on both the appeal and cross-appeal, provides only the most cursory review of the facts and law, and neglects to discuss many rich issues the parties thoroughly and effectively addressed, I respectfully decline to join in the recommendation for publication.

In response to footnote 5 of the majority opinion, I would only ask that readers carefully compare the majority's characterization of this concurring/dissenting opinion to the actual words I have written.