Brian HART, Plaintiff-Appellant,

v.

Kenneth BENNET and Family & Children's Center, Inc., Defendants-Respondents,

Mark R. ZELLMER and University of Wisconsin-La Crosse, Defendants.

Court of Appeals

*No. 02–2933. Submitted on briefs May 14, 2003.—
Decided October 16, 2003.*

2003 WI App 231

(Also reported in 672 N.W.2d 306.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Jeffrey C. Mochalski, Mochalski Law Office*, Holmen.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Michael P. Obert, Jr.* and *David J. Pliner*, Madison.

Before Dykman, Vergeront and Lundsten, JJ.

¶ 1. VERGERONT, J.   Brian Hart filed this action

after the coordinator of a men's abuse program in which Hart was participating sent a copy of a letter the coordinator wrote Hart to Hart's program supervisor at the University of Wisconsin-La Crosse. The complaint alleged violation of WIS. STAT. § 146.82 (2001–02),[1] which concerns confidentiality of patient health care records, and claims of defamation, professional negligence, and intentional infliction of emotional distress. The trial court dismissed all claims on summary judgment and Hart appeals. We conclude: (1) summary judgment was proper on the § 146.82 claim because, based on the undisputed facts, the letter was not prepared by or under the supervision of a health care provider as defined in WIS. STAT. § 146.81(1); (2) the trial court erred in deciding that the coordinator was not liable for the defamatory statements in the letter because it is not a defense that the coordinator accurately repeated what someone else told him about Hart; (3) the trial court erred in dismissing the professional negligence claim because the defendants did not establish that they were entitled to summary judgment on that claim; (4) summary judgment was proper on the claim for intentional infliction of emotional distress because, based on the undisputed facts, Hart did not suffer extreme and disabling emotional distress. Accordingly, we affirm in part, reverse in part, and remand for further proceedings on the defamation and professional negligence claims.

## BACKGROUND

¶ 2. In October 1997, Hart was charged with battery and two counts of disorderly conduct in a criminal complaint alleging that he had caused bodily

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

harm to his girlfriend, Deana Eley. At the time, Hart was enrolled in the Physician Assistant Program at UW-La Crosse. Mark Zellmer, the administrator of that program, gave Hart the option of taking a leave of absence from the program or being dismissed, and Hart requested a leave of absence. In December 1997, the Student Progress and Conduct Committee voted to dismiss Hart from the program. Hart appealed that decision.

¶ 3.   In July 1998, during the course of Hart's efforts to appeal his dismissal, he entered into a diversion agreement on the criminal charges. The agreement required participation in the Men's Abuse Program at the Family & Children's Center in La Crosse and required that Hart sign any releases necessary "to allow the counselor to report compliance or lack thereof, to the District Attorney's Office." Kenneth Bennet was employed by the Center as coordinator of the Men's Abuse Program. On September 8, 1998, Bennet wrote to the deferred prosecution coordinator stating that Hart had learned a great deal in the program, recommending further therapy, and concluding with the suggestion that the university committee reviewing Hart's dismissal consider that, although he had made a mistake, "he had made every effort to follow through with everything that was required of him," and he possessed the same qualities now as he did when he was admitted to the Physician Assistant Program. This letter was copied to Hart and to the attorney representing him in his appeal with the University.

¶ 4.   After writing that letter, Bennet spoke to Eley, and then wrote the letter to Hart that prompted this lawsuit. In this letter, Bennet stated that because of the information he received from Eley and from the victim witness coordinator, he was "recanting the posi-

tion and decision [he] presented in the previous letter." Bennet acknowledged that he had been at fault for not talking to Eley previously, but, he wrote,

[t]he greater fault is your failure to be honest with me. From our discussion [Eley informed me] that:

1. You were taking approximately 20 white crosses (amphetamines) a day.

2. In the month of August 1997, you hit her at least 15 of the 31 days -- even if it was a punch on her shoulder or a slap on the back of her head.

3. You compared [Eley] to your former partner Angie. You called her names such as "fat bitch" and "stupid". You treated her like a slave -- even on the evening you battered her, you ordered her to get your study materials after the beating and said you were leaving.

4. You wouldn't let her put on a seat belt, and said you were going to kill her and you.

5. You stole a key to Gundersen's library and made [Eley] have a copy made.

6. You told me you made [Eley] show you her phone bills and credit card slips when, in fact, you took them from her desk.

7. After having seen the pictures of [Eley], I can only say you were fortunate to have been given a diversion agreement rather than probation.

The letter concluded with Bennet's decision that Hart participate further in a program at the Center.[2] This

[2] The first paragraph of this letter stated:

I am baffled by the process you employ in working around appointments and schedules, or to avoid them entirely. Your

928

letter was copied to Hart's attorney, personnel at the district attorney's office, and to Zellmer.[3] It is undisputed that Bennet actually sent the letter to the persons copied.

¶ 5. The committee at UW-La Crosse that was reviewing Hart's dismissal either removed itself or was removed from further considering Hart's dismissal after receiving a copy of Bennet's September 18 letter from Zellmer. An ad hoc committee was then assigned to review Hart's dismissal. Ultimately the UW-La Crosse chancellor issued a decision overturning the decision of the ad hoc committee and finding that Hart had been afforded adequate due process in this dismissal from the Physician Assistant Program.

¶ 6. In his complaint, Hart alleged that Bennet knowingly violated Wis. Stat. § 146.82 by sending the September 18 letter to others without his consent.[4] For his defamation claim, he alleged that the September 18

---

behavior surrounding our last appointment is suggestive of someone who is attempting to forestall unwanted news. The news is something you won't want to hear, but I wanted to present it to you in person, however, that won't be necessary at this point.

[3] One of the persons copied was "Ann Quinlisk, D.V.I.P. Program Coordinator." We are unable to tell from the record who this person is, but we assume she is connected either with the Center or the District Attorney's Office. In any event, we understand from the record and briefs that Hart's claims all depend on the fact that Bennet sent this letter to Zellmer, and that none depend upon the letter being sent to the other persons copied.

[4] WISCONSIN STAT. § 146.82(1) provides:

(1) Confidentiality. All patient health care records shall remain confidential. Patient health care records may be released only to the persons designated in this section or to other persons with the informed consent of the patient or of a person authorized by the patient.

929

letter contained these false and defamatory statements that accuse Hart of committing crimes: (1) he possessed and used amphetamines; (2) he committed multiple acts of battery against Eley in August 1997; (3) he threatened to kill her, which, he alleges, constitutes disorderly conduct; and (4) he stole her personal belongings. Hart also alleged that Bennet was professionally negligent in relaying confidential therapist/client information to third parties without his consent, and that this conduct was extreme and outrageous, and done with the intent to cause Hart extreme emotional distress, which it did cause him. The Center was liable for Bennet's conduct, the complaint alleged, because Bennet was acting within the scope of his employment with the Center when he sent the letter.[5]

¶ 7. Bennet and the Center (the defendants) moved for summary judgment on these grounds: (1) the September 18 letter was not a health care record within the meaning of Wis. Stat. § 146.81(4) because it was not prepared by or under the supervision of a health care provider as defined in § 146.81(1) and it was "a letter

---

Hart also alleged in the complaint that Bennet violated Wis. Stat. § 146.83(4) by altering records that Bennet kept on his meetings with Hart. However, his arguments on appeal are confined solely to the September 18 letter. Accordingly, we do not separately address the claim of alteration of records. However, from our conclusion that the September 18 letter was not a "patient health care record" under Wis. Stat. § 146.81(4) because it was not prepared by or under the supervision of a health care provider as defined in § 146.81(1), it follows that the documents Hart alleged and averred that Bennet altered were not "patient health care records."

[5] The complaint also alleged claims against Zellmer and the University of Wisconsin-La Crosse. It appears that they have been dismissed from the action. At any rate, they are not involved in this appeal.

and not a record related to the health of a patient"; (2) the September 18 letter contained only true statements; and (3) the September 18 letter did not cause Hart's damages.[6]

¶ 8. Regarding Hart's claim under WIS. STAT. § 146.82, the defendants submitted the affidavits of the CEO of the Center, John Burgess, which averred as follows. Bennet was not licensed as a psychiatrist or psychologist in the State of Wisconsin and did not perform the services of a licensed psychiatrist or psychologist. The Men's Abuse Program, which he was employed to coordinate, was not a counseling program regulated by the Department of Regulation and Licens-

---

[6] The motion for summary judgment contained an additional ground—that Hart agreed to the release of the information contained in his health care records to Zellmer and others at UW-La Crosse. The defendants argued that Hart was aware that the September 8, 1998 letter had been copied to Hart's attorney for her use in the appeal of his dismissal from the Physician Assistant Program, and that constituted a voluntary authorization to release the information in that letter to Zellmer and others at UW-La Crosse. Since the September 18 letter was a "recantation" of the September 8 letter, the defendants continued, the voluntary authorization applied to the September 18 letter as well. In his affidavit, Hart averred that he did not give Bennet or the Center "permission to . . . release information regarding [his] counseling with Ken Bennet" to any person other than those named in the releases in the record, which do not include Zellmer or anyone at UW-La Crosse. The trial court did not address this argument and defendants do not appear to argue on appeal that it is an alternative ground on which to affirm the grant of summary judgment as to any claim. To avoid any misunderstanding, we conclude that the defendants are not entitled to summary judgment on the ground that Hart consented to the copying of the September 18 letter to Zellmer because, based on his affidavit, there are disputed issues of fact on that question.

ing, but was an intervention program using an instructional and modeling approach to teach certain skills on both a group and individual basis. The Center ran an outpatient mental health facility certified by the state and employed licensed psychiatrists and psychologists to meet the requirements of that certification, but the Men's Abuse Program had no relation to that facility, to the Children's Day Treatment Program or any other program regulated by the Wisconsin Department of Regulation and Licensing.

¶ 9. In support of the defendants' position that all the statements in the September 18 letter were true, the defendants submitted the affidavit of Eley, which related the particular statements she made to Bennet about Hart's conduct when Bennet contacted her sometime before September 18. Each of the points 1 through 6 in Bennet's letter accurately describes a statement Eley avers she made to Bennet.

¶ 10. In response, Hart submitted his affidavit denying the truth of Eley's statements concerning drugs, battery, disorderly conduct, and taking her property that were contained in the September 18 letter. Other averments in this affidavit are described later in the opinion.

¶ 11. The trial court concluded that, based on the undisputed facts, Bennet was not a health care provider under WIS. STAT. § 146.81(1) and was not working under the supervision of a health care provider. The court also concluded that, as a matter of law, the September 18 letter was not a patient health care record under § 146.81(4) because it was not "related to the health of a patient." With respect to the defamation claim, the court concluded that in the September 18 letter, Bennet was simply reciting information provided by Eley and was not conveying his opinion of Hart; and Eley, not

Bennet, was the source of any defamatory statement. The court entered an order dismissing all the claims against Bennet and the Center.

## DISCUSSION

¶ 12. We review the grant or denial of summary judgment de novo, applying the same standard as does the trial court. *Mach v. Allison*, 2003 WI App 11, ¶ 14, 259 Wis. 2d 686, 656 N.W.2d 766. A party is entitled to summary judgment if there are no disputed issues of fact and that party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2). The first step of the methodology is to analyze the complaint to determine whether it states a claim. *Mach*, 259 Wis. 2d 686, ¶ 15. If it does and if the defendant is moving for summary judgment, we examine the defendant's submissions to determine whether they establish a prima facie defense to the claim. *Id.*, ¶ 14. If they do, we then determine whether the plaintiff's submissions in response create a genuine issue of material fact that defeats the motion for summary judgment and entitles the plaintiff to a trial. *Id.*

A. Wisconsin Stat. § 146.82 Claim

¶ 13. Wisconsin Stat. § 146.82(1) provides that, with certain exceptions, all patient health care records shall remain confidential and may be released only to persons designated in the statute or to others with the informed consent of the patient or one authorized by the patient. Patient health care records are defined as "records related to the health of a patient prepared by or under the supervision of a health care provider." Wis. Stat. § 146.81(4). "Health care provider" is defined in

933

§ 146.81(1) and includes a number of health care professionals licensed or certified by statute. Section 146.81(1)(a)-(hp). It also includes a partnership of any of those providers, § 146.81(1)(i); a "corporation or limited liability company of any providers specified under pars. (a) to (hp) that provides health care services," § 146.81(1)(j); and a number of entities or facilities that are licensed or regulated by statute. Section 146.81(k)-(p).[7]

---

[7] WISCONSIN STAT. § 146.81(1) provides in full:

**Health care records; definitions.** In ss. 146.81 to 146.84:

(1) "Health care provider" means any of the following:

(a) A nurse licensed under ch. 441.

(b) A chiropractor licensed under ch. 446.

(c) A dentist licensed under ch. 447.

(d) A physician, physician assistant, perfusionist, or respiratory care practitioner licensed or certified under subch. II of ch. 448.

(dg) A physical therapist licensed under subch. III of ch. 448.

(dr) A podiatrist licensed under subch. IV of ch. 448.

(em) A dietitian certified under subch. V of ch. 448.

(eq) An athletic trainer licensed under subch. VI of ch. 448.

(es) An occupational therapist or occupational therapy assistant licensed under subch. VII of ch. 448.

(f) An optometrist licensed under ch. 449.

(fm) A pharmacist licensed under ch. 450.

(g) An acupuncturist certified under ch. 451.

(h) A psychologist licensed under ch. 455.

(hg) A social worker, marriage and family therapist, or professional counselor certified or licensed under ch. 457.

¶ 14. Hart contends that the trial court erred in applying Wis. Stat. § 146.82(1) because the court considered only whether Bennet was a health care provider and not whether the Center was a health care provider. There is no dispute that Bennet is not licensed as any health care provider listed in Wis. Stat. § 146.81(1)(a) to (hp).[8] However, Hart argues on appeal, as he did in the

(hm) A speech-language pathologist or audiologist licensed under subch. II of ch. 459 or a speech and language pathologist licensed by the department of public instruction.

(hp) A massage therapist or bodyworker certified under ch. 460.

(i) A partnership of any providers specified under pars. (a) to (hp).

(j) A corporation or limited liability company of any providers specified under pars. (a) to (hp) that provides health care services.

(k) An operational cooperative sickness care plan organized under ss. 185.981 to 185.985 that directly provides services through salaried employees in its own facility.

(L) A hospice licensed under subch. IV of ch. 50.

(m) An inpatient health care facility, as defined in s. 50.135(1).

(n) A community-based residential facility, as defined in s. 50.01(1g).

(p) A rural medical center, as defined in s. 50.50(11).

At the time relevant to this appeal, the definition of "health care provider" under Wis. Stat. § 146.81(1) had not been amended to include perfusionists, para. (d), athletic trainers, para. (eq), and massage therapists and bodyworkers, para. (hp). Because these changes do not affect our analysis, we cite to the current statute.

[8] Although Burgess' affidavit averred only that Bennet was not licensed as a psychologist or psychiatrist by the State of Wisconsin, Hart alleged in his complaint that, on information

trial court, that the Center is a health care provider under para. (1)(j) and the Center supervises Bennet, its employee; thus, contends Hart, the September 18 letter was "prepared . . . under the supervision of a health care provider." Section 146.81(4). According to Hart, the Center is a health care provider as defined in para. (1)(j) because it is a corporation and it employs individuals who are health care providers under § 146.81(1)(d) and (h)—licensed psychiatrists and psychologists.

¶ 15. It is not disputed that the Center is a corporation or that it employs licensed psychiatrists and psychologists. It is also not disputed that no licensed psychiatrist or psychologist is employed by the Center in the Men's Abuse Program and that Bennet is not supervised by a licensed psychiatrist or psychologist.[9]

and belief, Bennet "was not licensed by the State of Wisconsin," and no party contends otherwise.

[9] We are uncertain whether Hart is contending that there are disputed issues of fact on the question whether the Center is a health care provider under WIS. STAT. § 146.81(1)(j). If he is, we disagree. He asserts that the trial court considered only Burgess' affidavits and not that of Sonja Byrne, which he submitted. Byrne's affidavit avers that she was informed by staff of the Quality Assurance Division of the Wisconsin Department of Health and Family Services that the Center has been certified as an outpatient mental health clinic under WIS. ADMIN. CODE § HFS 61.91, and a day treatment center for children under WIS. ADMIN. CODE § HFS 40.11(2)(a) since 1994. Attached to her affidavit are copies of the Center's website pages, which describe the Center as "serv[ing] children, families and individuals with a continuum of services designed to strengthen families and promote individual well-being." The pages also describe specific services and programs of the Center. The Men's Abuse Program is referred to under the heading "Educational and Outreach Programs" as one of several programs "that

¶ 16.  Hart's argument requires that we construe WIS. STAT. § 146.81(1)(j). This presents a question of law, which we review de novo. *State v. Setagord*, 211 Wis. 2d 397, 405–06, 565 N.W.2d 506 (1997). The purpose of statutory interpretation is to discern the legislature's intent. *Id.* at 406. We first consider the language of the statute. *Id.* If that clearly and unambiguously sets forth the legislature's intent, we do not look outside the statutory language to ascertain that intent; rather, we apply the plain language to the facts at hand. *Id.* A statute is ambiguous when it is capable of being understood in two or more different senses by reasonably well-informed persons. *Id.* If a statute is ambiguous, we look to the scope, history, context, subject matter, and object of the statute in order to ascertain legislative intent. *Id.* When we construe a particular section of a statute, we do not consider it in isolation, but in the context of related sections. *J.L.W. v. Waukesha County*, 143 Wis. 2d 126, 130, 420 N.W.2d 398 (Ct. App. 1988).

¶ 17.  Beginning with the language of WIS. STAT. § 146.81(1)(j), the critical words are "[a] corporation or limited liability company of any providers specified under pars. (a) to (hp)." A readily apparent reasonable meaning of these words is that the corporation's shareholders are the providers listed in paras. (1)(a) through (hp). However, Hart reads this phrase to mean "a

address specific family issues: ... the Men's Abuse Program, a long-term education program to help men who have been violent toward a female partner." Byrne's affidavit is consistent, not inconsistent, with Burgess' affidavits regarding the Center's programs and services and the description of the Men's Abuse Program.

937

corporation *that employs* any providers." Although "of any providers" is an unusual way to say "that employs any providers," we will assume for purposes of argument that Hart's construction is a reasonable one. However, we conclude it is not the meaning the legislature intended. Rather, for the following reasons, we are persuaded that the more reasonable reading is that the corporation's shareholders are providers specified in paras. (a) to (hp).

¶ 18. First, many corporations employ licensed health care providers to provide health care services even though the business of the corporation has nothing to do with health—a factory might employ a nurse, for example, to provide health care services to its employees. Considering all such corporations as health care providers makes little sense in the context of this statute. Such corporations do not in any reasonable sense of the words prepare or supervise the preparation of records relating to the health care of their employees; that is done by the individual health care providers such corporations employ. Second, Hart's reading creates a category of "health care providers," a factory, for instance, that is not tied to any licensing, certification, or regulation by the state, unlike every other category listed in Wis. Stat. § 146.81(1). (In a partnership of providers under para. (i), each provider would, by definition, be licensed.) Third, if the legislature intended the meaning Hart proposes, it would be unnecessary to list the facilities listed in paras. (1)(k) through (1)(p) because they no doubt are corporations that employ health care providers listed in paras. (1)(a) through (hp).

¶ 19. Fourth, corporations that have shareholders who are health care professionals are specifically provided for and regulated by statute under Wis. Stat.

938

§§ 180.1901–1921.[10] This statute was enacted in 1961, well before Wis. Stat. § 146.81 was enacted in 1979.[11]

[10] WISCONSIN STAT. § 180.1903 provides:

**Formation of service corporation. (1)** Except as provided in sub. (1m), one or more natural persons licensed, certified, or registered pursuant to any provisions of the statutes, if all have the same license, certificate, or registration or if all are health care professionals, may organize and own shares in a service corporation. A service corporation may own, operate, and maintain an establishment and otherwise serve the convenience of its shareholders in carrying on the particular profession, calling, or trade for which the licensure, certification, or registration of its organizers is required.

**(1m)** A service corporation for carrying on the profession of certified public accounting may be organized under sub. (1) if more than 50% of the shareholders are certified public accountants.

**(2)** Professional or other personal services, consultation or advice in any form may be rendered only by directors, officers, agents or employees of the service corporation who are licensed, certified or registered pursuant to statute in the field of endeavor designated in the articles of incorporation of the service corporation.

**(3)** Liability may not accrue to a service corporation or its shareholders solely as a result of a decision to organize under sub. (1) or solely as a result of a decision to include or exclude a category of health care professionals as eligible to become shareholders of the service corporation.

**(4)** Each health care professional, other than a physician or nurse anesthetist, who is a shareholder of a service corporation and who has the authority to provide health care services that are not under the direction and supervision of a physician or nurse anesthetist shall carry malpractice insurance that provides coverage of not less than the amounts established under s. 655.23 (4).

[11] WISCONSIN STAT. §§ 146.81–83 were enacted by Laws of 1979, ch. 221 § 649t. That first version defined health care provider as:

**(1)** "Health care provider" means a nurse registered or licensed under ch. 441, a chiropractor licensed under ch. 446, a

939

By definition all shareholders in a service corporation are licensed, certified, or regulated by the state, Wis. Stat. § 180.1903(1), and this comports with the other categories in § 146.81(1).

■

¶ 20.   Construing Wis. Stat. § 146.81(1)(j) to mean a corporation that has shareholders who are providers as listed in paras. (a) to (hp), we conclude that, based on the undisputed facts, the Center is not such a corpora-

> dentist licensed under ch. 447, a physician, podiatrist or physical therapist licensed under ch. 448, an optometrist licensed under ch. 449, a psychologist licensed under ch. 455, a partnership thereof, a corporation thereof that provides health care services, an operational cooperative sickness care plan organized under ss. 185.981 to 185.985 that directly provides services through salaried employes in its own facility, or an inpatient health care facility as defined in s. 140.85(1).

At that time, Wis. Stat. § 180.99 (1979–80) governed service corporations and § 180.99(2) provided:

> (2) FORMATION OF CORPORATION. One or more natural persons licensed, certified or registered pursuant to any provisions of the statutes, provided all have the same license, certificate or registration, may organize and own stock in a service corporation under this section. Such corporation may own, operate and maintain an establishment and otherwise serve the convenience of its shareholders in carrying on the particular profession, calling or trade for which the licensure, certification or registration of its organizers is required; provided that professional or other personal services, consultation or advice in any form may be rendered only by officers, agents, or employes (as defined in sub. (9)) of such corporation who are themselves licensed, certified or registered pursuant to statute in the field of endeavor designated in the articles of such corporation.

Subsequently, this was renumbered and amended to the present version to allow, as an alternative to all shareholders having "the same license, certificate or registration," all shareholders to be "health care professionals" as defined in the statute. Sections 180.1903(1) and 180.1901(1m).

940

tion. From the name of the Center—"Family & Children's Center, Inc."—the only reasonable inference is that it is not a service corporation because it does not contain the designations required by law. *See* Wis. Stat. § 180.1907. Accordingly, the September 18 letter Bennet wrote is not a "a patient health care record" under § 146.81(4) because Bennet is not a health care provider within the meaning of § 146.81(1), and he was not supervised in the preparation of that letter by a health care provider. This conclusion makes it unnecessary to decide whether that letter meets other requirements of the definition of "patient health care record." The trial court therefore properly dismissed the claim for a violation of Wis. Stat. § 146.82.

## B. Defamation

¶ 21. The elements of a defamation claim are: (1) a false statement, (2) communicated by speech, conduct, or in writing to a person other than the person defamed, and (3) the communication is unprivileged and is defamatory, that is, tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her. *Mach*, 259 Wis. 2d 686, ¶ 12.[12]

---

[12] The court in *Torgerson v. Journal/Sentinel Inc.*, 210 Wis. 2d 525, 534 n.9, 563 N.W.2d 472 (1997), noted that more recent cases of this court had, without discussion, used a standard of four elements derived from Restatement (Second) of Torts § 558 (1977):   a false and defamatory statement; an unprivileged publication to a third party; fault amounting to at least negligence on the part of the publisher; and either actionability regardless of special harm or the existence of special harm

941

¶ 22. Hart argues on appeal that the trial court erred in concluding that Bennet was not, as a matter of law, liable for Eley's allegedly false and defamatory statements because he accurately repeated them. By "republishing" her statements, Hart contends, Bennet is liable for those defamatory statements. The defendants respond that we should not address this theory of liability because Hart did not brief it in the trial court, and the trial court therefore properly disregarded it. We disagree and conclude Hart did not waive the right to raise this theory of liability on appeal.

¶ 23. The complaint adequately states a claim for defamation based on Bennet's repeating Eley's statements to others. The complaint (1) attaches the September 18 letter, sets forth the specific statements in the September 18 letter that Hart is complaining about and alleges they are false;[13] (2) alleges that Bennet sent the letter to the persons named at the end of the letter, including Zellmer; and (3) alleges that those statements were not privileged and harmed his reputation. One can readily conclude that the specified statements meet the definition of defamatory in that they would "tend[] to harm one's reputation." *Mach*, 259 Wis. 2d 686, ¶ 12. It is evident from the complaint and attached letter that Hart is claiming that Bennet is liable to him because he

caused by the publication. *See, e.g., Erdmann v. SF Broad. of Green Bay, Inc.*, 229 Wis. 2d 156, 164, 599 N.W.2d 1 (Ct. App. 1999). However, the supreme court in *Torgerson* stated that "[f]or present purposes the distinctions between the two sets of elements, if any, are unimportant." 210 Wis. 2d at 535 n.9. The same is true in this case.

[13] WISCONSIN STAT. § 802.03(6) requires that "the particular words complained of shall be set forth in the complaint, but their publication and application may be stated generally."

repeated Eley's statements to others by sending the letter to persons other than Hart. There is no requirement that Hart specifically allege that Bennet is liable because he "repeated" or "republished" Eley's statements, as the trial court apparently thought.

¶ 24. In an effort to establish a defense to this claim, the defendants submitted Eley's affidavit to show that the statements Bennet attributed to her in his letter were indeed made by her. Hart's brief in response emphasized the falsity of Eley's statements, relying on his affidavit as a factual basis. In the defendants' reply brief, they contended it was irrelevant whether Eley's statements to Bennet were true because her affidavit established that she indeed told Bennet what he related in the letter. At the hearing on the motion, Hart's counsel responded to this argument by asserting that one can be liable by republishing defamatory statements. It would have been preferable if Hart had more fully explained in his brief why in his view the defendants' theory of defense was incorrect, rather than waiting until oral argument. Nonetheless, the emphasis in his brief—that it was the truth or falsity of Eley's statements that mattered—is the essence of his theory of Bennet's liability. Because we conclude Hart did not waive the right to argue on appeal that Bennet is liable for repeating Eley's statements to third parties, we next consider whether the trial court erred in ruling that, as a matter of law, Bennet was not liable.

¶ 25. Applying summary judgment methodology, we have already concluded the complaint states a claim for defamation against Bennet. Eley's affidavit establishes a prima facie defense to this claim only if accurately repeating her statements to others is a defense. It is not. "One who repeats or otherwise republishes

defamatory matter is subject to liability as if he had originally published it." RESTATEMENT (SECOND) OF TORTS § 578 (1977). In this context, "publication" means communication to a third person or persons. *Hucko v. Jos. Schlitz Brewing Co.*, 100 Wis. 2d 372, 377 n.3, 302 N.W.2d 68 (Ct. App. 1981). This rule applies when the original statement is spoken and the republisher repeats it to others in written form. RESTATEMENT (SECOND) OF TORTS § 578 cmt. d. The principle of the republisher's liability was recognized in Wisconsin almost a century and a half ago in *Sans v. Joerris*, 14 Wis. 722, 726 (1861):[14]

> The law is well settled that it is no justification in an action for libel, that the libelous matter was previously published by a third person, and that the defendant, at the time of his publication, disclosed the name of that person and believed all the statements in the libel to be true.

¶ 26. Because it is not a defense that Bennet accurately repeated Eley's statements, the trial court

---

[14] More recently we alluded to this principle in *Hucko v. Jos. Schlitz Brewing Company*, 100 Wis. 2d at 377, in addressing the liability of the original publisher. We explained that the originator of the statements is liable for any secondary publication that is the natural and probable consequence of his or her act, even though the secondary publisher, or republisher, may be liable as well.

We observe that some jurisdictions have recognized a "neutral reportage" privilege to the established common law rule of liability for republication; the privilege applies to charges about a public figure or public official in certain situations. 1 RODNEY A. SMOLLA, LAW OF DEFAMATION §§ 4:96–4:101 (2d ed. 1999). By adhering to the established common law rule in this case, we do not intend to express any view on the neutral reportage privilege.

erred in ruling the defendants were entitled on this ground to summary judgment on the defamation claim.

¶ 27. The trial court also concluded that Bennet was not liable because he did not convey in the letter that he believed Eley's statements were true. This was incorrect for two reasons. First, whether the republisher expresses belief or disbelief or neither does not affect liability: the republisher is subject to liability even if he or she expresses disbelief in the republished statement. RESTATEMENT (SECOND) OF TORTS § 578 cmt. e. "The fact that [the republisher] expresses belief or disbelief may, however, be taken into account in determining damages for the harm to the reputation of the person defamed for which the repeater will be liable." *Id.* Second, we conclude that the only reasonable reading of the September 18 letter is that Bennet believed Eley's statements were true. In the letter Bennet characterized her statements as "new information"; he stated that he was "recanting the position and decision" he had expressed in his September 8 letter; and he faulted Hart for not being honest with him. Indeed, the defendants concede this in a later section of their appellate brief: Bennet was entitled to copy this letter to Zellmer, they assert, because the information he received from Eley caused him to change his mind about the recommendation he had made to the University about Hart.

¶ 28. The defendants argue that we should affirm on the alternative basis that Bennet had a conditional privilege and did not abuse it.[15] According to the defendants, because Bennet had reason to believe that

---

[15] The defendants raised this defense in their reply brief in the trial court, but the court did not address it.

945

Hart or his counsel intended to show his September 8 letter to persons at UW-La Crosse to aid Hart in the review of his dismissal, Bennet had a legitimate interest in protecting his reputation by correcting what he now believed to be an inappropriate recommendation.

¶ 29.   Privileged conduct as a defense to a defamation claim is based on "the public policy that certain conduct which would otherwise be actionable may escape liability because the defendant is acting in furtherance of some interest of societal importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff." *Zinda v. Louisiana Pac. Corp.*, 149 Wis. 2d 913, 921–22, 440 N.W.2d 548 (1989). In the area of conditional privilege, we look to RESTATEMENT (SECOND) OF TORTS. *See id.* at 922. The conditional privilege the defendants rely on is:

§ 594. Protection of the Publisher's Interest

An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

(a) there is information that affects a sufficiently important interest of the publisher, and

(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.

RESTATEMENT (SECOND) OF TORTS § 594.

¶ 30.   A conditional privilege is forfeited if it is abused in any of these ways:

(1) [D]efendant . . . [had] knowledge or reckless disregard as to the falsity of the defamatory matter; (2) the

defamatory matter is published for some purpose other than that for which the particular privilege is given; (3) . . . the publication is made to some person not reasonably believed to be necessary for the accomplishment of the purpose of the particular privilege; (4) . . . the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged; or (5) the publication includes unprivileged matter as well as privileged matter.

*Zinda*, 149 Wis. 2d at 925 (citing Restatement (Second) of Torts §§ 600–605A).

¶ 31.  We cannot affirm the dismissal of the defamation claim on the ground of conditional privilege. There are reasonable inferences from the evidence that, if believed by a jury, would defeat this defense. To give just three examples:   (1) there is no evidence that Hart or his attorney had already forwarded the September 8 letter to UW-La Crosse, and no evidence that Bennet attempted to ascertain whether this had occurred; one could therefore reasonably infer that Bennet did not have a reasonable belief that copying the letter to Zellner was necessary to protect Bennet's interest and reputation; (2) it is reasonable to infer from the September 18 letter itself that Bennett did not contact Hart to hear his response to what Eley told him before copying the letter to Zellmer; one could reasonably infer from this that Bennet acted with reckless disregard of the truth or falsity of Eley's statements; and (3) a reasonable fact finder could decide that the September 18 letter contained defamatory material not reasonably believed to be necessary to accomplish the purpose for which Bennet claims the privilege.

947

¶ 32. In summary, we conclude that the trial court erred in granting summary judgment on the defamation claim and that Hart is entitled to a trial on this claim.

## C. Professional Negligence

¶ 33. Hart contends the trial court erred in dismissing the professional negligence claim because that claim is not dependent on the success of a claim under Wis. Stat. § 146.82 and the court provided no independent ground for dismissal of the negligence claim. The defendants respond that Hart did not present a separate argument in the trial court on the negligence claim and therefore we should not address it on appeal. We conclude Hart did not waive the right to present this argument on appeal.

¶ 34. Because the defendants moved for summary judgment, Hart's responsibility was to respond to their legal arguments and factual submissions. The only argument the defendants made in their first brief to the trial court that obviously related to the professional negligence claim (because it related to all claims) was that the September 18 letter did not cause Hart damages. In support of this assertion, they submitted Hart's responses to interrogatories from which one could reasonably infer that the September 18 letter was not considered by the persons that ultimately affirmed his dismissal from the Physician Assistant Program. In response, Hart averred that he had incurred additional legal expenses because the first committee had to be removed after receiving Bennet's letter from Zellmer and a second committee formed, and he attached billing

948

statements for his attorney's services. He also averred that he had undergone counseling and therapy from named providers regarding "confusion, disillusionment and therapist-patient trust caused by Ken Bennet's betrayal of confidence" in publishing the September 18 letter, and this counseling and therapy was in addition to the requirements of the diversion agreement. Hart's affidavit creates a disputed issue of fact on whether he incurred damages as a result of Bennet's copying of the letter to Zellmer. Accordingly, the defendants were not entitled to summary judgment on the professional negligence claim on the ground that Bennet's alleged negligence conduct did not cause damages.

¶ 35. It appears that the defendants may have assumed in their summary judgment motion that, if they prevailed in their arguments to dismiss Hart's Wis. Stat. § 146.82 claim, dismissal of the professional negligence claim was automatically proper. However, they did not make this argument in the trial court and they do not develop it on appeal.

¶ 36. With respect to the negligence claim, the complaint alleges: (1) Bennet was a practicing professional psychologist, who, although not licensed by the state, possessed the education, knowledge, and experience generally required of all practicing professional psychologists; (2) as a practicing professional psychologist, he had a duty in counseling Hart to exercise the degree of care, skill, and judgment that reasonable psychologists would exercise; (3) he breached this duty by relating, in the September 18 letter, confidential therapist/patient information to third parties without the client's consent; and (4) Hart was damaged as a result in that he suffered emotional harm requiring

psychotherapy and the UW-La Crosse appeal proceedings were disrupted, resulting in additional legal expenses.

¶ 37.   It is not self-evident that Bennet does not have the duty alleged in the complaint solely because he is not a health care provider within the definition of Wis. Stat. § 146.81(1); nor is it self-evident that the September 18 letter does not contain confidential information solely because it does not meet the definition of patient health care record in § 146.81(4). Because the defendants do not develop these arguments, we conclude they are not entitled to summary judgment on these grounds.

D. Intentional Infliction of Emotional Distress

¶ 38.   As with the claim for professional negligence, Hart contends the trial court erred in dismissing the claim for intentional infliction of emotional distress without explanation. His affidavit, he asserts, is sufficient to establish an issue of material fact with respect to each element of this claim. The elements are: (1) the defendant intended to cause emotional distress by his or her conduct; (2) that conduct was extreme and outrageous; (3) that conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) the plaintiff suffered an extreme disabling response to the defendant's conduct. *Rabideau v. City of Racine*, 2001 WI 57, ¶ 33, 243 Wis. 2d 486, 627 N.W.2d 795.[16]

---

[16] The defendants again argue that Hart waived the right to make this argument on appeal, and again we disagree. The defendants did not refer to the claim for intentional infliction of emotional distress in their first brief supporting their motion on summary judgment. In their reply brief, they referred to it in a

¶ 39. We conclude that Hart's affidavit is not sufficient to entitle him to a trial on his claim for intentional infliction of emotional distress because it is not sufficient to create a factual dispute on the fourth element of the claim—that his emotional distress was extreme and disabling. This standard is met only when the plaintiff is "unable to function in . . . other relationships because of the emotional distress caused by [the] defendant's conduct." *Alsteen v. Gehl*, 21 Wis. 2d 349, 360–61, 124 N.W.2d 312 (1963); *see also* WIS JI—CIVIL 2725. The only averments relating to his emotional reaction to Bennet's conduct are those we have recounted in the preceding section—that Hart engaged in counseling and therapy regarding "confusion, disillusionment and therapist–patient trust caused by Kenneth Bennet's betrayal of confidence" in publishing the September 18 letter, and this counseling and therapy was in addition to the requirements of the diversion agreement. Accepting these averments as true and drawing all reasonable inferences from them in Hart's

footnote, asserting that this "claim necessarily falls with the others, based on the arguments herein." In particular, they asserted, the evidence showed the first and second elements were not met as a matter of law. Defendants' counsel did not separately address this claim at oral argument. If their position is that their arguments on the defamation claim also defeated the first two elements of the emotional distress claim, then logically Hart adequately responded to their position by disputing their factual and legal assertions on the defamation claim. Indeed, because they first mentioned the emotional distress claim in their reply brief, Hart would have been entitled, had he asked, to the opportunity to submit additional factual material on that claim. He did not do so, and we understand from his brief on appeal that he is not contending he was deprived of an opportunity to submit additional factual material on this claim.

favor, we conclude that, as a matter of law, they fall far short of establishing extreme and disabling emotional distress. Accordingly, the defendants are entitled to summary judgment on this claim.

## CONCLUSION

¶ 40. We affirm summary judgment dismissing the claim under WIS. STAT. § 146.82 and the claim for intentional infliction of emotional distress. We reverse summary judgment on the defamation and professional negligence claims and remand for further proceedings on those claims.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.