James R. LEWIS, Plaintiff-Appellant,

v.

COURSOLLE BROADCASTING OF WISCONSIN, INC. Defendant-Respondent.

Supreme Court

---

[7] Because we so conclude, we need not reach other issues raised by the parties on appeal.

*No. 84–1881. Argued September 30, 1985.—Decided December 6, 1985.*

(Also reported in 377 N.W.2d 166.)

For the plaintiff-appellant there was a brief (in court of appeals) by *James W. Hammes, Brian G. Carroll* and *Cramer, Multhauf & Curran,* Waukesha, and oral argument by *Mr. Carroll.*

For the defendant-respondent there was a brief (in court of appeals) by *Don S. Peterson, Mark S. Schmitt* and *Minahan & Peterson, S.C.,* Milwaukee, and oral argument by *Don S. Peterson.*

WILLIAM A. BABLITCH, J. The primary issue involved in this case is novel: can an ex-public official, out of office for three years, be a "public figure" for purposes of a defamation action, notwithstanding his or her complete absence of involvement in the controversy that forms the basis of the alleged defamation?

James R. Lewis (Lewis) appeals a decision of the circuit court which granted summary judgment against him, concluding that he was a "public figure" at the time he was allegedly defamed by Coursolle Broadcasting of Wisconsin, Inc., (Coursolle), operator of radio station WLKE in Waupun, Wisconsin.

We conclude that Lewis' activities while he held public office and after his resignation were of such a nature

that he was a "public figure" for purposes of this defamation action. Accordingly, we affirm the circuit court's judgment.

The issues on appeal are: (1) is the issue of Lewis' status to be determined by the court or by a jury; (2) is Lewis a "public figure" for the purpose of this action; (3) if Lewis is a "public figure" for the purpose of this action, is he required to prove that Coursolle acted with "actual malice" in order to recover damages; and (4) did the circuit court err in granting summary judgment against Lewis?

Between 1972 and 1979 Lewis represented the 53rd district in the Wisconsin Assembly. During Lewis' tenure in the assembly, his district included portions of Dodge, Fond du Lac and Washington counties and the cities of West Bend and Waupun. As a legislator, Lewis introduced bills on topics which were controversial at both the state and national level, such as reinstitution of the death penalty by states and permitting sale of the purported cancer-cure "laetrile." In a deposition for this action Lewis described himself as having been an active, fulltime legislator who devoted himself to the legislative process, both in Madison and in his district.

In 1979 a federal court, upon a plea of guilty, convicted Lewis of perjuring himself before a federal grand jury in connection with its investigation of a scheme to manufacture laser weapons and sell them to Guatemala. On November 20, 1979, the court sentenced him to a six-month prison term for this offense. No longer legally eligible to serve in the assembly, Lewis surrendered his seat. He served 138 days of this sentence, beginning in December, 1979.

After his release from prison in May, 1980, Lewis petitioned the federal court to vacate his conviction. As the result of his effort to vacate his conviction, information which had been presented to the grand jury became public, including the 39-page transcript of a conversation between Lewis and an FBI agent recorded in Lewis' assem-

bly office on October 6, 1978. According to newspaper reports made a part of this record by incorporation into Coursolle's attorney's affidavit, the transcript revealed that Lewis planned to use his legislative position to protect other participants in a scheme to produce "laetrile" abroad and to provide laser weapons to foreign countries. Newspaper accounts of the transcript quote Lewis reassuring the agent that he could be "very useful" because foreign officials would hesitate to interfere with his official travels or with his associates and because he had opportunities as a legislator to be involved in the state's Latin American outreach programs. Newspaper publicity generated by the release of the grand jury's documents also included reports that Lewis participated in a plot to transmit names of Central Intelligence agents to the government of Taiwan and that he was involved in a plan to use laser weapons to destroy the control tower at O'Hare Airport in Chicago.

On the morning of December 22, 1982, radio station WLKE, which is located in Waupun, broadcast a news story which began: "James W. Lewis, the man who's accused of trying to extort one million dollars from the makers of '"Tylenol" after seven people died from poisoned capsules was a former representative to the 53rd district. . . ." The broadcast also described Lewis as ". . . well known and respected throughout the district, being a very visible representative who spoke to many service organizations and church groups." It noted that he had "gone to bat" for many causes, including a union strike at Waupun state prison in 1977. The broadcast correctly identified the accused "Tylenol" extortionist as James W. Lewis but inaccurately identified James R. Lewis as the same person. Later the same day, WLKE learned of its error. It broadcast retractions that afternoon and the next day.

In August, 1983, Lewis filed an action for defamation against Coursolle, which he later amended. In his

109

amended petition he sought $350,000 in actual and punitive damages. At that time, Lewis was employed as a lobbyist by the Wisconsin Coin and Precious Metal Association. He was also a minister.

In May, 1984, the circuit court heard oral arguments on a motion for summary judgment by Coursolle. Coursolle supported the motion with its attorney's affidavit which incorporated exhibits consisting primarily of copies of news articles on Lewis from 1976 through 1984. Coursolle also offered an affidavit by WLKE's newscaster and its deposition of Lewis. Lewis submitted his own affidavit which incorporated exhibits consisting mostly of news articles about James W. Lewis. The court granted Coursolle's motion.

The court of appeals certified this case to this court, which granted the appeal.

*Issue 1: Is Lewis' status to be determined by the court or by the jury?*

Lewis contends that his status as a "private" or "public figure" for the purpose of this action must be treated as a question of fact for the jury. According to Lewis, determining a plaintiff's status in a defamation action requires a finding of fact on his or her fame and notoriety in a given community which only a jury is competent to make. Coursolle argues that Lewis' status must be determined by the court as a matter of law.

The rule is well settled: determination of the status of a plaintiff in a defamation action is a question for the court to decide as a matter of law. *Rosenblatt v. Baer,* 383 U.S. 75, 88 (1966). In *Rosenblatt* the United States Supreme Court concluded that this rule would ". . . both lessen the possibility that a jury will use the cloak of a general verdict to punish unpopular ideas or speakers, and assure an appellate court the record and findings required for review of constitutional decisions." *Id.* at 88 n. 15. We implicitly adopted this rule in *Denny v. Mertz,* 106

Wis. 2d 636, 649–50, 318 N.W. 2d 141 (1982). In *Denny* we observed that the court must determine whether a plaintiff is a "public figure" for the purpose of a defamation action, when we affirmed the court of appeals' treatment of the issue as a matter of law. *Id.* at 642. Consequently, we hold that Lewis' status in this action is an issue for the court to determine as a matter of law.

*Issue 2:   Is Lewis a "public figure" for the purpose of this action?*

Because the status of a plaintiff in a defamation action against the media determines whether the plaintiff must prove negligence by the media or must meet a higher standard of proof in order to recover damages, the issue of status must be resolved before the issue of liability.

Lewis argues that he must be considered a "private figure" in this action. He emphasizes that he has not held public office since 1979 and has been "out of the public limelight" since early 1980. He claims that his "public" status terminated in 1979 and that his subsequent activities did not bring him such fame that he could be considered a "public figure" in 1982. Coursolle counters that Lewis' conduct during his years in the assembly and afterwards was so "notorious" that he must be considered a "public figure," citing *Cepeda v. Colwes Magazines and Broadcasting, Inc.*, 392 F. 2d 417, 419 (9th Cir. 1968), in which the court of appeals included among "public figures" anyone ". . . who is famous or infamous because of who he is or what he has done." Coursolle contends that Lewis' notoriety can be measured by the numerous extraordinary events with which he has been publicly identified since 1972.

This case presents the seemingly never ending dilemma of attempting to accommodate important and competing values which naturally arise in media-defamation actions: the individual's interest in compensation for harm to reputation inflicted by defamatory state-

ments versus the public's need for the press to operate in a vigorously free manner. Beginning with *New York Times Co. v. Sullivan,* 376 U.S. 254, 269–70 (1964), the United States Supreme Court and this court have recognized that accommodating the tension created by these values implicates the freedoms of speech and of the press which are protected by the first amendment to the federal constitution. *See Dalton v. Meister,* 52 Wis. 2d 173, 183, 188 N.W. 2d 494 (1971), *cert. denied* 405 U.S. 934 (1972).

Because freedom of the press is a right which directly benefits the public in a self-governed society, the United States Supreme Court has frequently recognized the public interest in exercising this right by the press. It has also recognized the danger of creating conditions which promote self-censorship by the press, thereby defeating the public interest in a free flow of information on issues of public concern. Accordingly, in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974) the Court wrote:

> ". . . punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press. . . . [and] may lead to intolerable self-censorship. Allowing the media to avoid liability only by proving the truth of all injurious statements does not accord adequate protection to First Amendment liberties." *Id.* at 340.

Similarly, in discussing protections extended to some defamatory speech prior to *New York Times,* this court wrote:

> "Conditional privileges or immunities from liability for defamation are based upon public policy which recognizes the social utility of encouraging the free flow of information in respect to certain occasions and persons, even at the risk of causing harm by the defamation. . . .
> " 'Were such protection not given, true information which should be given or received would not be

communicated through fear of the persons capable of giving it that they would be held liable in an action of defamation unless they could meet the heavy burden of satisfying a jury that their statements were true.' " (Citations omitted.) *Lathan v. Journal Co.,* 30 Wis. 2d 146, 152, 140 N.W. 2d 417 (1966).

Recently the United States Supreme Court's attempts to accommodate the tensions in media-defamation cases have focused on distinctions between defamation actions brought by "private" individuals or institutions and those brought by "public" individuals or institutions. Beginning with *New York Times,* the Court has protected the public interest in freedom of the press by requiring that "public" individuals prove "actual malice" to recover damages in defamation cases. *Id.* at 279–80. The Court has described the motivating force for the *New York Times* decision as follows:

> "[w]e expressed 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open' . . . There is, first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues." *Rosenblatt* at 85.

Although the Court in *New York Times* applied the "actual malice" standard only to "public officials," it subsequently extended the protection to actions brought by "public figures" who are not "public officials" but nevertheless are involved in issues in which the public has a justified and important interest. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 134 (1967). In doing so, it discussed the importance to the public of debate on the activities of these "public figures":

> " ' . . . public figures,' like 'public officials,' often play an influential role in ordering society. . . . Our citizenry has a legitimate and substantial interest in

113

the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.' The fact that they are not amenable to the restraints of the political process only underscores the legitimate and substantial nature of the interest, since it means that public opinion may be the only instrument by which society can attempt to influence their conduct." *Id.* at 164. (Warren J., concurring).

In 1974 the Court recognized the need to delineate more specifically the categories of individuals in the public eye to whom the *New York Times* standard applies. In *Gertz* the Court held that an attorney who represented the plaintiffs in a controversial civil suit against a police officer was not a "public figure" for the purpose of his action against a magazine which made false statements about him. *Gertz* at 352. Refusing to extend the *New York Times* protection to defamations of "private" individuals, the Court reviewed at length the purposes of the protection in cases brought by "public figures." According to the Court, the most important consideration was that individuals who seek public office or otherwise seek public attention have accepted the risk of greater public scrutiny which is a necessary consequence of involvement in public affairs. *Id.* at 344.

The Court clarified that the *New York Times* standard applies to two broad categories of "public" individuals: "public figures" and "public officials." The first category includes "[t]hose who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures. . . ." *Id.* at 342. The Court concluded that the category of "public figures" included at least two classifications. It designated as "public figures for all purposes" those individuals who have attained "public figure" status by assuming ". . . roles of especial prominence in the af-

fairs of society" or by occupying ". . . positions of . . . persuasive power and influence. . . ." *Id.* at 342, 345. It designated as a second classification those individuals who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* at 345. This classification has become known as "public figures for a limited range of issues." 75 ALR 3rd 616 (1977).

The Court defined its second broad category, "public officials," to include ". . . those who hold governmental office. . . ." *Id.* at 342. It described the public interest in this category in these terms: ". . . society's interest in the officers of government is not strictly limited to the formal discharge of official duties. . . . [T]he public's interest extends to 'anything which might touch on an official's fitness for office'. . . ." (Citation omitted.) *Id.* at 344–45.

Thus, before we determine whether the *New York Times* standard applies to Coursolle in this case, we must determine whether Lewis fits any category of individuals in the public eye to whom the standard applies. Although we do not determine that these are the only categories to which the standard applies, we need not go further than those categories to reach a conclusion in this case.

It is clear that Lewis is not a "public official." He has not been a "public official" since he resigned from his assembly office in 1979. Further, we agree with Lewis and Coursolle that he was not a "public figure for a limited range of issues," because he in no way "thrust himself" into the "Tylenol" extortion controversy. Therefore, the only question becomes whether Lewis, notwithstanding the termination of his "public official" status in 1979, was a "public figure for all purposes" in December, 1982, when Coursolle broadcast its report incorrectly linking him to the "Tylenol" case.

We conclude that this record establishes that James R. Lewis was at the time of the alleged defamation a "public figure for all purposes." We by no means conclude that

115

"once a public official, always a public figure." Lewis was, however, more than a public official who simply gained elective office in 1972, represented his constituents and performed his legislative duties until 1979, and then resigned to drift quietly into oblivion. He was much more.

Our review of this record leads us to conclude that there was a special public interest in information about Lewis which arose during his years in the assembly and continued after his official resignation. In this case, the record contains undisputed evidence that Lewis pleaded guilty to perjury before a federal grand jury while in office, for an act done while in public office, and that he has attempted to vacate that conviction. That attempt generated widespread publicity, including the public release of grand jury documents. The record also contains news articles which Coursolle incorporated into its attorney's affidavit and whose content Lewis does not dispute, which report that Lewis used his status as an elected public official to promote activities with no connection to his official responsibilities. These articles allege that he was involved in non-legislative activities such as a plot to manufacture and distribute "laetrile" nationally and internationally, a conspiracy to transmit names of Central Intelligence agents to a foreign government, and a plot to use laser weapons to destroy the control tower at O'Hare Airport in Chicago. They also state that Lewis revealed plans to use his legislative position to protect other participants in these schemes to an FBI agent in a discussion which was recorded in his office and later presented to a federal grand jury.

In this appeal Lewis does not deny his federal conviction for perjury on a plea of guilty nor that he has tried to vacate that conviction. He also does not deny his participation in any of the schemes with which the press linked his name between 1972 and 1982 or dispute the accuracy of press reports that the federal grand jury heard a tape-

recorded conversation between him and an FBI agent in which he promised to use his public position to protect others involved with him.

Whether Lewis intended to draw public attention to himself through his activities is irrelevant. The question is whether an elected public official, such as Lewis, who commits perjury while in office and who does not deny that he participated in highly controversial and newsworthy activities while in public office which had little or no relationship to his official duties, should escape the searching public scrutiny which inevitably comes to an individual in this position who participates in such activities simply because he has resigned from office. We think not. To the contrary, his conduct in office and afterwards raised questions which were as worthy of public discussion in 1982 as in 1979. He had, in short, achieved the notoriety which the United States Supreme Court has declared makes an individual a "public figure for all purposes." Accordingly, we hold that Lewis was a "public figure for all purposes" in this action.

Although the circuit court concluded that Lewis' "public figure" status was local, statewide and national in scope, we do not reach the question of his status beyond the region involved in this action. We interpret the category of "public figure" articulated in *Gertz* as implying some specific geographic context as a limit. As the United States Court of Appeals has pointed out, when the Supreme Court determined that the plaintiff in *Gertz* was not a "public figure," it noted that Gertz did not have "general fame and notoriety in the community" and was not generally known to "the local population." *Waldbaum v. Fairchild Publications, Inc.,* 627 F. 2d 1287, 1295–96 n. 22 (D.C. Cir. 1980). For that reason, the court of appeals concluded that ". . . nationwide fame is not required. Rather, the question is whether the individual had achieved the necessary degree of notoriety where he was defamed—i.e., where the defamation was published." *Id.*

117

at 1296 n. 22. Similarly, other courts have measured a plaintiff's "fame or notoriety" in regard to a specific locality or community. *See Brewer v. Memphis Pub. Co., Inc.,* 626 F. 2d 1238, 1253 (5th Cir. 1980); *Lawrence v. Moss,* 639 F. 2d 634, 636 (10th Cir.), *cert. denied,* 451 U.S. 1031 (1981); *Mobile Press Register, Inc. v. Faulkner,* 372 So.2d 1282, 1286 (Ala. 1979); *Steere v. Cupp,* 602 P.2d 1267, 1273 (Kan. 1979); and *Clements v. Gannett,* 5 Media L. Rep. (BNA) 1657, 1660 (N.Y. Sup. Ct. 1979). We also adopt a community standard as a logical limit on the status of a "public figure."

According to Lewis' complaint, WLKE broadcast its report from Waupun. Therefore, the listening audience encompassed approximately the same geographic area as Lewis' former legislative district. We conclude accordingly that this region constitutes the community in which Lewis was a "public figure" for the purpose of this action. We need not and do not reach the question of his status in regard to the state or nation.

*Issue 3: Is Lewis required to prove that Coursolle acted with "actual malice" in order to recover damages?*

In certifying this case, the court of appeals questioned whether a "public figure" must prove that the publisher of a defaming statement acted with "actual malice" in order to recover damages, or whether lack of involvement in the controversy giving rise to the defamation exempts a "public figure" from that standard. Lewis does not address this question directly, arguing instead that his lack of involvement in the "Tylenol" controversy establishes that he was a "private figure" in this action. Coursolle contends that a determination that Lewis was a "public figure" resolves this issue. We agree.

The standard for determining liability in a defamation action by a "public figure" against the media is unambiguous. As this court recognized in *Denny,* a "public fig-

ure" must prove that the press made a defaming statement with "actual malice," that is, with " '. . . knowledge that it was false or with reckless disregard of whether it was false . . .' " in order to recover damages. *Denny* at 643.

Our review of *Gertz* and subsequent cases indicates that involvement in the controversy separates "private" figures from "public figures for a limited range of issues" but that once a court has classified a plaintiff as either a "public figure for all purposes" or a "public figure for a particular controversy," the plaintiff must establish that the media acted with "actual malice" in order to recover damages. *See Wolston v. Reader's Digest Assn., Inc.*, 443 U.S. 157, 167 (1979). In *Wolston* the Court emphasized that the trial court must evaluate the nature and extent of an individual's participation in the controversy giving rise to the defamation in order to determine whether that involvement made an otherwise "private" individual a "public figure." *Wolston* at 167.

For these reasons, we hold that Lewis was required to prove that Coursolle acted with "actual malice" to recover damages in this action.

*Issue 4: Did the circuit court err in granting summary judgment against Lewis?*

When reviewing a circuit court's grant of summary judgment, this court must apply the standards and methods set forth in sec. 802.08, Stats. *Board of Regents v. Mussallem*, 94 Wis. 2d 657, 674, 289 N.W. 2d 801 (1980). According to this standard of review, we must uphold a grant of summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *May-*

*nard v. Port Publications, Inc.,* 98 Wis. 2d 555, 558, 297 N.W. 2d 500 (1980). (*Quoting* sec. 802.08(2).)

Thus, this court will reverse the judgment of the circuit court only if it incorrectly decided a legal issue or if material facts are in dispute. *Id.; Prince v. Bryant,* 87 Wis. 2d 662, 666, 275 N.W. 2d 676 (1979).

The circuit court held, and we have affirmed, that Lewis was a "public figure" in this action and that he therefore was required to prove "actual malice" to establish Coursolle's liability. As a result, we conclude that there is no legal error by the circuit court which requries reversal. Consequently, unless we conclude that there was a dispute on an issue of material fact which required trial, we must affirm the court's action.

Lewis argues that this case requires trial because evidence shows that he had been "out of the public limelight since early 1980," proving that he was a "private figure." Similarly, he contends trial is needed because evidence indicates that Coursolle's employees did not verify the accuracy of their report before going on the air, proving that Coursolle acted with "actual malice."

Lewis' arguments disregard the critical distinction between propositions of fact and conclusions of law. "Propositions of fact are descriptive; conclusions of law are dispositive. Propositions of fact state history; conclusions of law assign legal significance to that history." Morris, *Law and Fact,* 55 Harv. L. Rev. 1303, 1329 (1942) As we have frequently stated, whether facts fulfill a particular legal standard is a question of law. *Nottelson v. ILHR Department,* 94 Wis. 2d 106, 115–16, 287 N.W. 2d 763 (1980).

In this case, the only dispute of fact concerned whether Lewis suffered harm to his reputation from Coursolle's false broadcast. That dispute was not "material" because the fact of harm would not be dispositive of the case.

There was no dispute of fact regarding Lewis' activities between 1972 and 1982. The record contains no evidence that Lewis controverted either the fact of extensive newspaper coverage of his activities prior to December 22, 1982, in his former district or the content of the news articles which Coursolle incorporated into its affidavit in support of summary judgment.

Similarly, there was no dispute of fact about Coursolle's actions. Coursolle did not deny Lewis' assertion that its employees did not verify the "Tylenol" story. In his deposition WLKE's newscaster stated that the station did not independently verify the accuracy of its report which was based on a story which a statewide newspaper had published.

We have already addressed Lewis' argument that his actions since 1979 make him a "private figure" in this action, concluding that he was instead a "public figure for all purposes" based on the undisputed facts in this record. We now address his argument that WLKE's failure to verify its report raises a factual question which required trial.

In *Gertz* the Supreme Court adopted a trial court's finding that mere proof of failure to investigate the accuracy of a statement, without more, cannot establish ". . . reckless disregard for the truth." *Gertz* at 332. Even considered in the light most favorable to Lewis, Coursolle's affidavits and Lewis' deposition establish only that WLKE employees responsible for the "Tylenol" story did not investigate whether Lewis, the former legislator, and Lewis, the accused extortionist, were the same person. Because we conclude that facts proving the failure of WLKE's employees to verify the accuracy of their report would not establish that Coursolle acted with "actual malice" or "reckless disregard for the truth," we conclude that resolution of this issue did not require trial.

Because we find no legal error by the circuit court and no dispute on an issue of material fact, we hold that the court did not err in granting summary judgment for Coursolle.

We do not reach Lewis' arguments on damages because we find that he failed to establish a basis for Coursolle's liability.

*By the Court.*—The judgment of the circuit court is affirmed.

LOUIS J. CECI, J. *(dissenting).* I dissent. I find it most unfortunate that the majority fails to consider the constitutional responsibility attendant with the right of free speech as set forth in the Wisconsin Constitution.

The first amendment of the United States Constitution should not be used to protect outright false statements of the media nor should it eclipse state-granted protections against defamatory activity. The majority has obviously chosen to follow the U. S. Supreme Court's interpretations of the first amendment on defamation matters, rather than to look to the Wisconsin Constitution for guidance. Article 1, sec. 3 of our state constitution extends to every person the right to freely speak, write, and publish. It states:

> "Every person may freely speak, write and publish his sentiments on all subjects, *being responsible for the abuse of that right,* and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact." (Emphasis added.)

122

Thus, in Wisconsin "being responsible for the abuse of" the right of free speech fully coexists with the right itself.

I would not quarrel with the majority's unconsidered adoption of federal case law on defamation matters if the wording and impact of the applicable provisions of the U. S. Constitution and the Wisconsin Constitution were the same. But the Wisconsin Constitution includes a clause which establishes a responsibility for the abuse of free speech; the U. S. Constitution does not. The majority does not consider or address this responsibility in its opinion. Asserting over a newscast without verifying the truth of the statement that James R. Lewis is accused in a Tylenol extortion plan I perceive to be an abuse of Coursolle's right of free speech. Coursolle now should be held responsible for the abuse of its right.

The Wisconsin Constitution not only grants the right of free speech to the citizens of this state, it also protects these same citizens from an abuse of that right, including abusive and irresponsible reporting by the media. The majority's decision unfortunately fails to acknowledge the constitutional protections against defamation extended by the state's constitution to citizens of this state.

I also disagree with the majority's conclusion that James R. Lewis is a public figure for all purposes.

The majority outlines the tension of competing interests which attend media-defamation actions. The individual has an interest in protecting his good reputation; the public has a need for the press to operate in a free and uninhibited manner (majority opinion at 111–112). The majority, however, destroys this necessary balance by seemingly ignoring the individual's interest in protecting his reputation from defamatory statements.

Certainly the public has a right to receive information about public issues and about public figures "who are in a position significantly to influence the resolution of those issues." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). But Lewis was no longer in a position of significant influ-

123

ence at the time of the Tylenol broadcast; he had left the state legislature in 1979. The public's right to know—through the vehicle of an uninhibited press—is overshadowed by Lewis' right to protect his reputation. Even though the public might still be interested in and curious about Lewis' post-legislative activities, its right to know about such activities does not rise to the same level of legitimate interest which existed when Lewis was a member of the legislature. Therefore, the public's right to know should not be protected to the same extent it was protected when Lewis was a member of the legislature. That is, Lewis should not be required to show actual malice in the broadcasting of the Tylenol story merely because "there was a special public interest in information about Lewis. . . ." (Majority at 116.)

The majority notes that Lewis "does not deny that he participated in highly controversial and newsworthy activities while in public office which had little or no relationship to his official duties . . . ." (At 117.) I submit that many ex-legislators have engaged in controversial and newsworthy activities while in public office. What is newsworthy, however, often is determined by an editor who, through his editorial decisions, chooses what is important for public consumption. Merely being so chosen for mention in the media ought not to determine one's status for the purpose of the purpose of defamatory actions.

Because the majority does not consider the responsibilities attendant with the right of free speech as embodied in the Wisconsin Constitution and because I disagree with the majority's conclusion that Lewis is a public figure for all purposes, I respectfully dissent. I would reverse the trial court's decision in granting summary judgment for Coursolle.