Vincent R. Biskupic, Plaintiff-Appellant,†

v.

Stacey Cicero, Safe Haven Domestic Abuse
Support Center, f/k/a Domestic Abuse Support
Center, Philadelphia Indemnity Insurance
Company, The Shawano Leader, a Division of
Madison Newspapers, Inc., Rod Christensen,
Kent Tempus, Joe Vandelaarschot, a/k/a
Joe Vandel and ABC Insurance Company,
Defendants-Respondents.

Court of Appeals

*No. 2007AP2314. Submitted on briefs May 28, 2008.
—Decided June 17, 2008.*

2008 WI App 117

(Also reported in 756 N.W.2d 649.)

† Petition to review granted and dismissed.

225

227

230

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *John C. Peterson* of *Peterson, Berk & Cross, S.C.*, Appleton.

On behalf of the defendants-respondents, Stacey Cicero, Safe Haven Domestic Abuse Support Center, and Philadelphia Indemnity Insurance Company, the cause was submitted on the brief of *Todd A. Becker* and *Diane B. Kraft* of *Coyne, Schultz, Becker & Bauer, S.C.*, Madison.

On behalf of the defendants-respondents, The Shawano Leader, Rod Christensen, Kent Tempus and Joe Vandelaarschot, the cause was submitted on the brief of *Gregory B. Conway* and *David L. Lasee* of *Liebmann, Conway, Olejniczak & Jerry, S.C.*, Green Bay.

Before Hoover, P.J., Peterson and Brunner, JJ.

¶ 1. PETERSON, J. Vincent Biskupic is a former Outagamie County District Attorney and an unsuccessful candidate for Wisconsin Attorney General. He claims he was defamed by a newspaper article published by the Shawano Leader in August 2004. The article incorrectly stated Biskupic had been involved in bribery and graft.

¶ 2. Biskupic sued eight defendants, including the Leader, several of its employees, and Stacey Cicero, an individual quoted in the article.[1] The circuit court granted summary judgment dismissing the suit. We conclude Biskupic is a public figure. In order to prevail,

---

[1] For clarity, we refer to the Leader, its employees and its insurer collectively as the Leader. We refer to Cicero, her employer and her insurer collectively as Cicero.

he must prove that the defamation was made with actual malice. On this record, there is not sufficient evidence of actual malice to create a genuine factual dispute on that issue. We therefore affirm the summary judgment. We also reject Biskupic's argument that the circuit court should have granted him judgment as a sanction for the Leader destroying evidence.

## BACKGROUND

¶ 3. Biskupic was Outagamie County District Attorney from 1994 until January 2003. In 2002, he ran unsuccessfully for Wisconsin Attorney General. During that campaign, an open records request revealed payments by Outagamie County criminal defendants and potential defendants to a crime prevention fund Biskupic controlled. Some of the payments were ordered as part of the defendants' sentences, while other payments were made under agreements in which no charges were filed or in which the defendant entered into a deferred prosecution agreement. An Ethics Board investigation, which ended in October 2003, expressed concerns about the practice but did not sanction Biskupic. The board concluded Biskupic did not profit personally from the fund and was not affiliated with any organization that received money from it.

¶ 4. Before he was elected district attorney, Biskupic worked for five years in the Winnebago County District Attorney's Office, including three years as deputy district attorney. At the time, Joe Paulus was Winnebago County District Attorney. In 2002, Paulus was voted out of office amid bribery allegations. In April 2004, Paulus was convicted of two federal charges for accepting approximately $50,000 to fix cases. The record includes fifty-six news articles and editorials from 2002 through 2005 mentioning both Paulus and

233

Biskupic. Some discuss cases both Paulus and Biskupic were involved in prosecuting, while others cite the allegations against both men as a reason for changes in the justice system.

¶ 5. In July 2004, the circuit court judges in the Ninth Judicial Administrative District, which includes Shawano County, voted to stop the practice of judges ordering convicted defendants to pay money to non-profit organizations. On August 23, 2004, the Leader ran an article about the district's decision under the headline "Agencies to lose thousands if fee on criminals ends." The article included information from Stacey Cicero, the executive director of Safe Haven, a domestic abuse prevention organization. Cicero stated the courts had been ordering defendants convicted of domestic abuse to pay $20 to domestic abuse prevention programs such as Safe Haven. The article continued:

> Judges from [the Ninth Judicial District] met in July and voted to eliminate the fees next year.

> "I believe it was done in response to the bribery and graft cases involving former Winnebago County District Attorney Vince Biskupic," said Cicero.

> Biskupic was convicted of accepting bribes to dismiss cases. Some of the money that defendants paid to have their cases dismissed went to organizations that he (Biskupic) was involved in or into his own pocket.

¶ 6. The next day, the Leader ran a correction of the article. The correction stated:

> A story in Monday's edition incorrectly referred to Vince Biskupic as a former Winnebago County District attorney [sic] accused of bribery and graft.

> The name of that official is Joe Paulus, who was recently sentenced in federal court for personally accepting about $48,000 to reduce or avoid court cases.

> Also, according to Shawano County Circuit Court Judge J.R. Habeck, the Paulus case had nothing to do with the cutoff of funding for [crime prevention organizations].
>
> Biskupic is a former Outagamie County district attorney. When he ran for the Wisconsin Attorney General office, an issue was raised as to whether he acted properly by accepting funds for [crime prevention organizations] as an alternative to prosecution.
>
> Habeck said he's never heard or seen any allegation that Biskupic personally benefitted from these funds. He has not been charged.
>
> However, Biskupic was rebuked by the state Ethics Board in 2003 for striking secret deals with defendants to avoid prosecution in exchange for payments of up to $8,000 to local anti-crime groups and his privately operated crime-prevention fund.
>
> It was this issue, Habeck said, that raised statewide judicial awareness of the possibility of paying sums without court proceedings, leading to a review of [crime prevention organization] practices.

The Leader ran a second correction on its front page in early September in response to a demand letter from Biskupic.

¶ 7. Biskupic filed suit in August 2005. He alleged two claims relevant here: slander against Cicero and libel against the Leader. Biskupic alleged Cicero's comments to the Leader slandered him, and the Leader libeled him when it printed Cicero's comments and the paragraph stating Biskupic had been convicted of accepting bribes.

¶ 8. In her deposition, Cicero stated she had been accurately quoted in the article. She said when she was interviewed for the article, she intended to refer to

Paulus, and had a "brain lapse" and inadvertently used Biskupic's name instead. Cicero said she did not believe she was the source of the information in the paragraph following her quote—that Biskupic had been convicted of bribery and graft and that money intended for nonprofits had gone into Biskupic's pocket—although she could not "recall the specific conversation."

¶ 9. Joe Vandel,[2] the reporter who wrote the story, was also deposed. Vandel said both Cicero's quote and the information in the paragraph following the quote came from Cicero. He said Cicero had provided him with correct information dozens of times in the past, and he had "no reason to believe what she was telling me was incorrect." Vandel admitted that in hindsight he "probably should have" verified the information, but at the time he did not doubt its veracity.

¶ 10. Vandel said he had no specific recollection of taking notes for this particular story, but his normal process was to take notes. When a story was finished, he would put his notes in a drawer. When the drawer filled up, he would discard the notes at the bottom, the notes from the oldest stories. Vandel said after the second retraction was printed he believed the matter was taken care of and there was no need to retain his notes any longer. He said his notes from the story had likely been discarded when they reached the bottom of his drawer.

¶ 11. All defendants moved for summary judgment, and Biskupic moved for judgment as a sanction for Vandel's destruction of his notes. The circuit court granted all defendants summary judgment. The court concluded Biskupic was a limited purpose public figure,

_____

[2] Joe Vandel is also referred to as Joe Vandelaarschot in the caption and record. The parties use "Vandel" in their briefs, and we do likewise.

and the actual malice standard applied. The court held the summary judgment submissions showed "the defamation occurred as a result of confusion and negligence, not malice." The court denied Biskupic's motion for sanctions.

## DISCUSSION

¶ 12. Whether summary judgment is appropriate is a question of law reviewed without deference to the circuit court, using the same methodology. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2);[3] *Green Spring Farms*, 136 Wis. 2d at 315. We view the facts in the light most favorable to the party opposing the motion. *State Bank of La Crosse v. Elsen, 128 Wis. 2d 508, 511–12, 383 N.W.2d 916 (Ct. App. 1986)*.

### I. Biskupic's status as a public figure

¶ 13. Defamation is a false statement that tends to harm a person's reputation.[4] *Hart v. Bennet*, 2003 WI App 231, ¶ 21, 267 Wis. 2d 919, 672 N.W.2d 306. When the person defamed is a public figure, that person must

---

[3] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

[4] Wisconsin cases use two different formulations of the elements of defamation other than actual malice, one with three elements and one with four. *Hart v. Bennet*, 2003 WI App 231, ¶ 21 n.12, 267 Wis. 2d 919, 672 N.W.2d 306. The elements of defamation other than actual malice are not relevant here.

prove that the false statement was made with actual malice. *Wiegel v. Capital Times Co.*, 145 Wis. 2d 71, 82, 426 N.W.2d 43 (Ct. App. 1988).

¶ 14. The first question in this appeal is whether Biskupic is a public figure. If he is, Biskupic must prove the Leader or Cicero acted with actual malice. *See id.* Whether a person is a public figure is a question of law reviewed without deference. *Lewis v. Coursolle Broadcasting*, 127 Wis. 2d 105, 110, 377 N.W.2d 166 (1985).

¶ 15. The actual malice standard originated in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Sullivan was an elected city commissioner in Montgomery, Alabama. *Id.* at 256. For First Amendment reasons, the Court held that a public official cannot successfully sue for defamation unless the official proves the defamatory statement was made with actual malice. The courts later expanded this rule beyond public officials to include public figures: persons who become involved in a public controversy or who assume a public role that warrants treating them in the same way as public officials. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).

¶ 16. There are two kinds of public figures: public figures for all purposes and public figures for a limited purpose. *Maguire v. Journal Sentinel, Inc.*, 2000 WI App 4, 232 Wis. 2d 236, 242–43, 605 N.W.2d 881 (Ct. App. 1999). A person is a public figure for all purposes when he or she has "general fame or notoriety" in the location the defamation takes place. *Gertz*, 418 U.S. at 351–52; *see also Lewis*, 127 Wis. 2d at 117–18. There is no set test for when a person has "general fame or notoriety." Instead, courts look at a number of factors, including evidence of the person's name recognition,

press coverage of the person, whether the person has shunned or encouraged media attention, and whether the person has access to the media such that he or she would likely be able to respond to false information. *See Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1295 (D.C. Cir. 1980) (collecting cases). The guiding principle of this inquiry is that a public figure for all purposes has become involved in public affairs to an extent that he or she can be deemed to have accepted the same level of scrutiny as a public official. *Gertz*, 418 U.S. at 344–45. Like public officials, public figures for all purposes must prove actual malice in all circumstances. *Lewis*, 127 Wis. 2d at 119.

¶ 17. Limited purpose public figures, on the other hand, are otherwise private individuals who have a role in a specific public controversy. *Van Straten v. Milwaukee Journal Newspaper-Publisher*, 151 Wis. 2d 905, 913–14, 447 N.W.2d 105 (Ct. App. 1989). Limited purpose public figures are required to prove actual malice only when their role in the controversy is "more than trivial or tangential" and the defamation is "germane to [their] participation in the controversy." *Id.*

¶ 18. Here, Biskupic was a public official until January 2003, when his term as district attorney ended. Biskupic contends that by August 2004, when the article was published, he was a private citizen, not a public figure of any kind. The Leader and Cicero contend Biskupic was a public figure for all purposes in 2004 because of ongoing publicity surrounding Biskupic's actions, both while he was district attorney and afterward. They contend that if Biskupic was not a public figure for all purposes, he was at least a public figure for a limited purpose. They argue he was in-

239

volved in a controversy over defendants' payments to nonprofits, and the article was germane to that controversy.

¶ 19. We conclude Biskupic was a public figure for all purposes in 2004. As a result, we need not decide whether he was a public figure for a limited purpose.[5] *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issues need be addressed).

¶ 20. Our supreme court addressed a similar situation in *Lewis*, 127 Wis. 2d at 116–17. James Lewis was a state legislator in the Waupun area from 1972 to 1979. *Id.* at 108. He resigned in November 1979 after pleading guilty to perjury in connection with a plot to manufacture laser weapons and sell them to Guatemala. *Id.* After serving a short prison sentence, Lewis attempted to withdraw his plea. The plea withdrawal

---

[5] The trial court concluded Biskupic was a limited purpose public figure and Biskupic argued that issue in his initial appellate brief. The Leader and Cicero, in their response briefs, argued that Biskupic was a general purpose public figure as well as a limited purpose one. Biskupic replied that Cicero and the Leader may not raise the general purpose issue because they have not filed a cross-appeal. He argues a cross-appeal is required because the circuit court granted summary judgment on the grounds that Biskupic was a limited purpose public figure, not a general purpose public figure. However, it is well-settled law that we may affirm a judgment on different grounds than those relied on by the circuit court. *International Flavors & Fragrances, Inc. v. Valley Forge Ins. Co.*, 2007 WI App 187, ¶ 23, 304 Wis. 2d 732, 738 N.W.2d 159; *see also State v. Holt*, 128 Wis. 2d 110, 124–25, 382 N.W.2d 679 (Ct. App. 1985). A cross-appeal is only necessary when a respondent "seeks a modification of the judgment or order appealed from or of another judgment or order entered in the same action or proceeding . . . ." WIS. STAT. RULE 809.10(2)(b).

240

motion resulted in the release of grand jury information indicating Lewis had attempted to use his position as a legislator to facilitate several other schemes, including a plot to destroy the control tower at O'Hare Airport using laser weapons. *Id.* In December 1982, a radio station in Waupun ran a story on a different James Lewis accused of attempting to extort money from the makers of Tylenol. *Id.* at 109. The station incorrectly identified James Lewis the legislator as the man involved in the extortion scheme. *Id.*

¶ 21. Lewis sued. He argued he ceased to be a public figure in early 1980, soon after his legislative career ended. *Id.* at 111. The court acknowledged that a public official would not automatically remain a public figure forever after leaving office. *Id.* at 116. However, Lewis was not just "a public official who simply gained elective office in 1972, represented his constituents and performed his legislative duties until 1979, and then resigned to drift quietly into oblivion." *Id.* Instead, because of the charges and ongoing publicity, "there was a special public interest in information about Lewis which arose during his years in the assembly and continued after his official resignation." *Id.* The court went on to explain:

> The question is whether an elected public official, such as Lewis, who commits perjury while in office and who does not deny that he participated in highly controversial and newsworthy activities while in public office which had little or no relationship to his official duties, should escape the searching public scrutiny which inevitably comes to an individual in this position who participates in such activities simply because he has resigned from office. We think not. To the contrary, his conduct in office and afterwards raised questions which were as worthy of public discussion in 1982 as in 1979. He had, in short, achieved the notoriety which the

United States Supreme Court has declared makes an individual a "public figure for all purposes."

*Id.* at 117 (citations omitted). The court noted that at a minimum Lewis would have achieved the necessary degree of notoriety in the Waupun area, which roughly corresponded to his former legislative district. *Id.* at 118.

¶ 22. The same analysis applies here. Biskupic was district attorney—a public official—until January 2003. He ran for statewide office and became embroiled in a highly publicized controversy over his crime prevention fund. The controversy over this fund resulted in extensive news coverage—as evidenced by well over 100 news articles in the record—and a statewide debate over the propriety of crime prevention funds that continued well after Biskupic left office. Biskupic's actions also resulted in the Ethics Board investigation, which ended in October 2003—well after Biskupic left office.

¶ 23. In addition to the publicity over his crime prevention fund, Biskupic was in the news in 2003 over an Elections Board audit that found a number of campaign finance rule violations in Biskupic's attorney general campaign.[6] Finally, in spring and summer 2004, Biskupic's name was mentioned in a number of news articles discussing allegations of prosecutorial miscon-

---

[6] Cicero notes that Biskupic was also in the news in September and October 2004 over allegations that he suborned perjury and withheld evidence in a 1994 Winnebago County case. The parties dispute whether news coverage after the August 2004 Leader article can be used to establish Biskupic was a public figure at the time the article was published. Because we conclude there is ample evidence Biskupic was a public figure for all purposes even without the later articles, we need not reach this issue. *See Patrick Fur Farm, Inc. v. United*

duct by Paulus. While the publicity surrounding these issues was statewide, it was especially prevalent in Appleton, Green Bay and Oshkosh.[7] Shawano is approximately forty-five miles from Appleton and forty miles from Green Bay, and Shawano County adjoins both Brown and Outagamie counties.

¶ 24. This evidence shows Biskupic, like Lewis, was not simply a public official who served in office for a time, then left "to drift quietly into oblivion." *See Lewis*, 127 Wis. 2d at 116. Instead, like Lewis, Biskupic was involved in "highly controversial and newsworthy activities while in public office." *See id.* at 117. The publicity and controversy surrounding these events, in particular Biskupic's crime prevention fund, continued well after Biskupic's term ended. Biskupic also remained in the news after leaving office as a result of new developments in the various inquiries into his official conduct and his connection to Paulus. As a result, as in *Lewis*, there was a "special public interest" in Biskupic that arose while he was in office and continued after he left office. *See id.* at 116.

¶ 25. We conclude that, like Lewis, Biskupic cannot escape public inquiry into his official conduct simply by leaving office. In August 2004, Biskupic was less than two years removed from his district attorney position and his run for statewide office. He also was less than a year removed from the conclusion of various investigations into his conduct and was currently being mentioned in the ongoing investigation of Paulus. As a

*Vaccines, Inc.*, 2005 WI App 190, ¶ 8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (court of appeals decides cases on the narrowest possible grounds).

[7] The record includes fifty-three articles from Appleton newspapers prior to August 2004 and a somewhat lower number from Green Bay and Oshkosh newspapers.

result, Biskupic was in the public spotlight in August 2004 to at least the same degree as when he left office. At a minimum, he remained in the public eye in Appleton and its surrounding area, including Shawano.

¶ 26. Biskupic argues he was not a public figure because he was not a "celebrity" or "household" name in August 2004. *See Maguire*, 232 Wis. 2d at 243 (citing *Waldbaum*, 627 F.2d at 1294). However, the only evidence Biskupic cites for this proposition is the fact that his name was mentioned only once in the Leader prior to August 2004. Biskupic does not argue the Leader is the only place Shawano area residents might have heard of him, nor does he attempt to explain why they would not have been exposed to the extensive news coverage in nearby cities or the publicity associated with his run for attorney general. Nor does Biskupic attempt to explain how his situation is any different from that of the plaintiff in *Lewis*, and we see no difference.

## II. Actual malice

¶ 27. The parties next disagree on whether Biskupic has created a material factual dispute as to whether Cicero or the Leader acted with actual malice. Actual malice means either the defendant knew the statement was false, or made the statement with reckless disregard for whether it was true or false. *Erdmann v. SF Broad.*, 229 Wis. 2d 156, 169–70, 599 N.W.2d 1 (Ct. App. 1999). Biskupic does not argue the defendants knew the statements in the article were false. Instead, he focuses on reckless disregard. To show reckless disregard, Biskupic "must show that the defendant[s] in fact entertained serious doubts as to the publication's truth." *See id.* (citing *Van Straten*, 151 Wis. 2d at 917).

Actual malice must be proven by clear and convincing evidence. *Maguire*, 232 Wis. 2d at 250 n.3.

■

¶ 28. Defamation cases present constitutional concerns not present in typical summary judgment cases, including "the possibility that a jury will use the cloak of a general verdict to punish unpopular ideas or speakers" and the potential for a chilling effect on free speech. *Lewis*, 127 Wis. 2d at 110; *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 539–40, 563 N.W.2d 472 (1997). As a result, courts have a constitutional duty to scrutinize the summary judgment record, and "summary judgment is an important and favored method for adjudicating public figure defamation actions." *Torgerson*, 210 Wis. 2d at 539–40.

■

¶ 29. This does not mean that a defendant may escape liability simply by denying doubts about a story. *St. Amant v. Thompson*, 390 U.S. 727, 732–33 (1968). In certain instances, a jury may infer doubts about a story from circumstantial evidence:

> The defendant . . . cannot . . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Id.* at 732. However, courts must carefully review the summary judgment record to be sure the plaintiff's evidence actually establishes subjective doubt, as opposed to simply a violation of journalistic standards. *See Torgerson,* 210 Wis. 2d at 539–40, 552. Failure to investigate an allegation, standing alone, is not sufficient to show subjective doubts exist. *St. Amant,* 390 U.S. at 733; *Van Straten,* 151 Wis. 2d at 918–19.

¶ 30. Biskupic argues actual malice may be inferred from circumstantial evidence present here. He points to evidence that neither Cicero or Vandel attended the judges' meeting, both Cicero and Vandel had time to investigate further had they chosen to do so, none of the individuals Cicero or Vandel talked to mentioned Biskupic, and Vandel destroyed his notes before litigation. Biskupic also argues there is a material factual dispute over whether Vandel fabricated the paragraph following Cicero's quote.

¶ 31. We disagree. First, Vandel did not have "obvious reasons" to doubt the veracity of Cicero's account. *See St. Amant,* 390 U.S. at 732. He had used Cicero as a source in the past and found her to be reliable. The allegation Cicero made—that a Winnebago County District Attorney had been involved in bribery and graft—was not "inherently improbable"; indeed, it had actually happened. *See id.* And while it is true that no other source in the article mentioned Biskupic by name, three other sources quoted in the article provided information that appeared to corroborate Cicero's mistake. Judge Habeck was quoted in the article comparing the Shawano County assessments to "the controversy in Winnebago County." Judge Dorothy Bain, the district's chief judge, was quoted as saying, "Let's face it, there have been some cases lately where money

has been a real issue." Shawano police chief Ed Whealon was quoted as admitting there had been "misuses in other counties." Biskupic's assertion that Vandel ignored "contrary" information from other sources simply is not consistent with the record.

¶ 32. As for Cicero's and Vandel's failure to use additional time to investigate, Biskupic relies heavily on *Hunt v. Liberty Lobby*, 720 F.2d 631, 634 (11th Cir. 1983), a case involving an article by a freelance journalist alleging Hunt would be framed by the CIA for the John F. Kennedy assassination. However, the publishers in that case admitted they had reason to question the author's motivations and did not attempt to confirm easily verifiable details, even though they had time to do so. *Id.* at 645. Under those circumstances, the court concluded a jury could conclude the publishers actually doubted the article's truth. *Id.* at 646.

¶ 33. Here, by contrast, Vandel did not have any reason to question Cicero's motives or the veracity of her information. As for Cicero, there is no evidence her mistake was anything other than a failure to double check the name of the former Winnebago County District Attorney. Both defendants' actions fall under the general rule that failure to verify information, without more, is not evidence of actual malice. *See Van Straten*, 151 Wis. 2d at 918–19.

¶ 34. We also disagree with Biskupic's assertion that the evidence shows Vandel fabricated the information in the paragraph following Cicero's quote. We agree with Biskupic that, viewing the evidence in his favor, we must assume Vandel wrote that paragraph himself. However, fabrication refers to situations where journalists "invent quotations and attribute them to actual persons." *Carson v. Allied News Co.*, 529 F.2d 206, 213 (7th Cir. 1976). In that situation, a reporter will "necessarily

entertain[] serious doubts as to the truth of the statements." *Id.* Here, by contrast, if Vandel wrote the paragraph himself, at most the paragraph reflected a second mistake in which Vandel compounded Cicero's misidentification by adding details of the allegations against Paulus and Biskupic and attributing them solely to Biskupic.[8] The information therefore was not a quotation plucked from Vandel's imagination; instead, it was an extension of Cicero's mistake. *See St. Amant*, 390 U.S. at 732. Viewed in the light most favorable to Biskupic, the record does not allow a reasonable inference that Vandel doubted the veracity of the information in that paragraph.

¶ 35. This leaves Vandel's destruction of his notes. In general, the destruction of notes allows an inference that the notes would have provided evidence of actual malice. *Torgerson*, 210 Wis. 2d at 548. This inference "will ordinarily defeat a news media defendant's motion for summary judgment." *Id.* However, this rule is not absolute. The court in *Torgerson* ultimately held that dismissal was appropriate even though the notes were selectively destroyed and the reporter was aware a defamation suit was likely. *Id.* at 527, 550. The court concluded because of the specific facts present in that case, the possibility the notes might establish actual malice was too remote. *Id.* at 552.

---

[8] The Leader story appears to draw facts from both cases. It states, "Some of the money defendants paid to have their cases dismissed went to organizations that [Biskupic] was involved in or into his own pocket." However, Paulus was convicted of taking bribes from a defense attorney, not misappropriating money paid to a crime prevention fund. Biskupic maintained a crime prevention fund, but did not use the fund for his own benefit.

¶ 36. The same rationale applies here. Biskupic argues only that the notes might show Cicero was not the source of the information in the paragraph following her quote. However, as explained above, even if Vandel was the source of the paragraph, it was an extension of Cicero's mistake, not a product of Vandel's imagination. *See St. Amant*, 390 U.S. at 732; *Carson*, 529 F.2d at 213. Because Biskupic has not shown any way the notes might show actual malice, the destruction of the notes does not create a material factual dispute preventing summary judgment. *See Torgerson*, 210 Wis. 2d at 552.

¶ 37. "A court's role is to interpret and apply the law, not to enforce standards of journalistic accuracy or ethics." *Id.* While Biskupic has produced substantial evidence that journalistic standards were not followed here, he has not produced evidence creating a material factual dispute as to whether Cicero or the Leader "in fact entertained serious doubts" about the truth of the statements in the article. *See Erdmann*, 229 Wis. 2d at 169–70. Absent such evidence, Cicero and the Leader are entitled to summary judgment.

## III. Sanctions

¶ 38. Finally, Biskupic argues the court should have granted him judgment against the Leader as a sanction for destroying evidence—specifically, for destroying Vandel's notes.[9] Whether to impose sanctions

---

[9] In the alternative, Biskupic argues the court should have sanctioned the Leader by instructing the jury that Vandel's destruction of notes "can be considered as evidence of malice." However, as explained earlier, Biskupic has not presented a reasonable theory as to how the contents of the notes could show actual malice. Absent such a theory, Biskupic has not

for the destruction of evidence is committed to the court's discretion. *Morrison v. Rankin*, 2007 WI App 186, ¶ 15, 305 Wis. 2d 240, 738 N.W.2d 588 (citation omitted). A discretionary ruling will be affirmed if the circuit court "examined the relevant facts, applied a proper standard of law, and, utilizing a demonstratively rational process, reached a conclusion that a reasonable judge could reach." *Id.* If the court does not explain the reasons for a discretionary decision, we may search the record to determine whether it supports the court's decision. *Randall v. Randall*, 2000 WI App 98, ¶ 7, 235 Wis. 2d 1, 612 N.W.2d 737.

¶ 39. Sanctions for destruction of evidence serve two purposes: upholding the justice system's truth-seeking function and deterring parties from destroying evidence. *Morrison*, 305 Wis. 2d 240, ¶ 16. Judgment as a sanction is only appropriate as a sanction for "egregious conduct." *Garfoot v. Fireman's Fund Ins. Co.*, 228 Wis. 2d 707, 724, 599 N.W.2d 411 (Ct. App. 1999). In the document destruction context, this means the court must find the documents were destroyed as "a conscious attempt to affect the outcome of litigation or a flagrant, knowing disregard of the judicial process." *Id.*

¶ 40. Here, the court denied Biskupic's motion without analysis. However, the record shows that, at most, Vandel destroyed his notes when he should have known litigation was possible. There is no dispute that the notes were destroyed in Vandel's usual course of business, as opposed to selectively, and they were de-

---

created a jury issue on actual malice, and the proffered jury instruction would be of no use to him. The only sanction useful to Biskupic is a directed verdict on actual malice by the Leader—the equivalent of judgment against the Leader. We therefore focus our discussion on that sanction.

stroyed before this suit was filed.[10] In addition, as explained above, Biskupic has not shown how anything in the notes could have established actual malice. Under those circumstances, the record would not have supported a finding that the notes were destroyed as "a conscious attempt to affect the outcome of litigation or a flagrant knowing disregard of the judicial process." *See id.* The record therefore supports the court's discretionary decision, and we affirm that decision despite the court's failure to place its reasoning on the record. *See Randall*, 235 Wis. 2d 1, ¶ 7.

¶ 41. Biskupic argues this case is akin to *Morrison*, 305 Wis. 2d 240, ¶ 27, where we upheld a directed verdict as a sanction. However, *Morrison* involved a doctor who destroyed all of his medical records shortly after the court adjourned a trial to allow inquiry into his other cases. *Id.*, ¶¶ 8–9. The circuit court found that the doctor intentionally destroyed the records "knowing that the destruction would eliminate evidence that would have been favorable to [the plaintiff] and unfavorable to him." *Id.*, ¶ 23. This showed "an attempt to affect the outcome of the litigation, which constitutes egregious conduct." *Id.* (citing *Garfoot*, 228 Wis. 2d at 724). The same cannot be said here. There is simply no

---

[10] Biskupic argues the Leader knew litigation was likely because of his retraction demand letter. However, the letter did not threaten litigation and concluded by stating, "I appreciate your attention to this important matter. I am also asking that a copy of the published correction be mailed to me for my records." It is undisputed that the Leader complied with the letter in all respects, and Vandel testified he believed the retraction disposed of the matter. Even assuming the letter gave Vandel reason to believe a suit might still be filed, this falls far short of showing that Vandel destroyed his notes intentionally in an attempt to influence a potential suit.

evidence in the record suggesting Vandel destroyed his notes in an effort to influence the outcome of possible future litigation or engaged in any other egregious conduct. Absent evidence to that effect, judgment is not available as a sanction. *See id.*

*By the Court.*—Judgment affirmed.